SIMPSON ELECTRIC COMPANY, a Division of American Gage and Machine Company, Inc., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 80–2193.

United States Court of Appeals, Seventh Circuit.

Argued May 15, 1981.

Decided July 15, 1981.

Christopher B. Nelson, Chicago, Ill., for petitioner.

Ann Rolader, Region 13, NLRB, Arlington, Va., for respondent.

Before BAUER, Circuit Judge, NICHOLS, Judge,* and WOOD, Circuit Judge.

NICHOLS, Judge.

This case is a petition for review and cross-petition for enforcement of an order of the National Labor Relations Board (NLRB). Simpson Electric Company (Simpson), is a division of American Gage and Machine Company, Inc. It operates 10 plants in various parts of the country, but the present controversy concerns only the one at Elgin, Illinois. The business is the manufacture of electrical parts and components. There is no known organization drive now at the Elgin plant, but Simpson objects to doing what it is currently still under NLRB orders to do, namely, to post a notice that it will not again commit the unlawful and unfair labor practice of attempting to influence an organizing campaign by granting a wage increase shortly before a representation election. Simpson denies it granted the admitted increase with any improper motive. The NLRB found to the contrary, but we hold that its finding lacks the support of substantial evidence. Therefore we deny the petition for enforcement and grant the petition for review.

The chronology of the case is significant. On June 6, 1978, the International Brotherhood of Electrical Workers (Union), commenced an organizing campaign among Simpson's employees. On October 25, 1978, the NLRB conducted a representation election which the Union won. Simpson, however, protested unfair practices by the Union, and before November 17 learned informally that the NLRB agreed, and that the election would have to be run again. On November 17 Simpson announced increases in wages, fringe benefits, and health insur-

ance, to be effective in all of its plants, including the nine others not involved in any organizing activity. Plans for the increase were budgeted and already in the works before the first election. Besides this, Simpson explains the timing as due to its well-informed anticipation of an increase in the federal minimum wage, which would benefit many of the same employees, and to the fact that an increase at recurrent intervals had become its regular practice. The NLRB Administrative Law Judge (ALJ) refutes this latter explanation on the ground that in prior years the mix of the benefits was different, a difference we deem very irrelevant. We may take judicial notice that inflation was raging on the pertinent dates, as it still is, and employees expected wage and benefit adjustments at least annually merely to stay where they were. It is not found that Simpson's employees felt overwhelmed by any unexpected shower of largesse. In fact, there is no direct evidence as to what the employees of Simpson's Elgin plant thought about it.

The NLRB seems to think Simpson should have delayed the increase past the Christmas season, not only at Elgin, but also at its nine plants not involved in the organizational drive. The unfairness of this solution to non-Elgin employees who were mere bystanders, if that, in the dispute, would have made it indefensible. *Delchamps, Inc. v. NLRB*, 588 F.2d 476 (5th Cir. 1979). On the other hand, to have delayed the increase at the Elgin plant alone certainly would have exacerbated a resentment of Elgin employees at this invidious discrimination. Whether their resentment would have been directed at Simpson, the Union, or the NLRB are matters for interesting speculation and possibly the answer would depend on how well they were informed as to the reasons for the delay. It would seem the Union could have been spared from at least sharing in the resentment only if the employees were kept in ignorance of the reasons for the delay

---

* The Honorable Philip Nichols, Jr., Associate Judge of the United States Court of Claims, is sitting by designation.

and attributed it to the employer's whim. Some think or assume that the minds of employees are so easily manipulated and so easily kept in ignorance that they will think anything they are told to think. In the real world, employers and unions both find this difficult.

Simpson also says on November 17 it had not learned when the rerun election would occur and had recommended a cooling off period of 90 days.

On November 30, however, the NLRB announced that the rerun election would take place on December 21. Asked why if the NLRB thought the vote would be tainted by the wage announcement, it did not set the election at a later date, counsel responded this would have been to reward the wrongdoer. As further explained, Union organizing campaigns have a certain momentum which is interrupted only at the Union's disadvantage. Therefore, a delay in the election would make the Union's task more difficult. What this explanation fails to account for is that the Union's wrongdoing was the reason why a new election was necessary. On the other hand, whether the employer was also a wrongdoer is the very matter we are to determine. The explanation, therefore, assumes the answer and is a complete logical fallacy. We are given no rational reason why, if the rerun election was expected to be tainted, it was not set at a later date so the taint could clear away.

■ The law is clear that an employer commits an unfair labor practice prohibited by Section 8(a)(1) of the National Labor Relations Act if he announces a pay increase or withholds one with intent to influence an ongoing organizing drive or representation election. *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 459, 11 L.Ed.2d 435 (1964). *See NLRB v. Gruber's Super Market, Inc.*, 501 F.2d 697, 709 (7th Cir. 1974); *NLRB v. Furnas Electric Co.*, 463 F.2d 665, 669 (7th Cir. 1972); *NLRB v. Drives, Inc.*, 440 F.2d 354, 363 (7th Cir. 1971); *Texaco, Inc. v. NLRB*, 436 F.2d 520, 524 (7th Cir. 1971).

■ This rule is easier to state than apply, for an employer who means to influence an election will rarely say so, and his intent must be determined by weighing the credibility of his denial against the attendant facts and circumstances he invites attention to. *See NLRB v. Frantz and Company*, 361 F.2d 180, 183 (7th Cir. 1966), where this court considered "substantial evidence on the record as a whole" in upholding the board's determination that the wage increase in question was granted to discourage employees from supporting the union. It is necessary to look to the evidence "as a whole" to determine whether a wage increase is an unfair labor practice, *NLRB v. W.T. Grant Co.*, 208 F.2d 710, 712 (4th Cir. 1953).

■ The employer is not required to defer implementation of plans for benefit increases made before the Union drive and happening to come to fruition during its continuance. *Pedro's Inc. v. NLRB*, 652 F.2d 1005 (D.C.Cir. 1981). The employer is in somewhat of a dilemma since the consequences of a decision to pay a planned increase, or defer it, may alike be the basis of an unfair labor practice holding if his own assessment of the purity of his motives is not shared by the NLRB. *J.J. Newberry Co. v. NLRB*, 645 F.2d 148 (2d Cir. 1981), invites attention to the dilemma an employer encounters if plans to improve employee benefits happen to come to fruition when an NLRB election is about to occur. The court concludes that an employer who withholds an increase shall be protected if he does not capitalize on the situation, if he acts on advice of counsel, etc. While the NLRB here thought the employer did capitalize on the increase, the facts reflect no more than an effort to inform the employees of what would be coming their way. This without more we do not consider capitalization.

■ During the continuance of the current inflation it would appear probable that the grant of an increase, at least within the rate of inflation, would have a minimal emotional impact upon the employees, unless the employer's propaganda invited em-

ployees' attention to its alleged bearing on the Union drive rather expressly. The denial of one, if persisted in, would have correspondingly a maximum effect, propaganda or no propaganda. Accordingly, we believe that a grant of benefits, according to a regular time pattern, not exceeding the rate of inflation, and without special propaganda, should be viewed as a neutral act, regardless of any mere time relation to an organizing campaign, as long as inflation continues. Inflation is something the trier of fact, the ALJ, wholly failed to take into account, and in face of it his reasons for disbelieving the employer's denials seem inadequate, arbitrary, and irrational. *Cf. Delchamps, Inc. v. NLRB, supra.* Our view is that routine unexploited wage and benefit increases within the rate of inflation, as here, should be viewed for section 8(a)(1) purposes as the same as no action in a condition of stable currency value. The employer also urged it was concerned by an excessive rate of turnover. The ALJ views this as inconsistent with the other reasons already given, but it is hard to see why. He says it was not a new situation and Simpson had lived with it for some time. Of course one might live with a cancer for some time, but this would not mitigate the seriousness of one's concern when one finally went to the doctor.

The foregoing would suffice to raise serious questions in our minds about enforcing the order even if the NLRB's setting the date of the election, actually only after announcement of the increase, had instead occurred before. In that event, the decision might be close. As the facts were, the employer could not know the election was imminent. The subsequent choice of an election date convinces us the NLRB either did not really think the increase would seriously influence the representation election results or else acted for improper purposes. We do not draw adverse inferences about NLRB motives as readily as it does about Simpson's motives, despite the implausibility of the explanation offered. We presume it acted in entire good faith. But we believe it may have been influenced to an impermissible extent by a desire to punish Simpson for its presumption in granting a pay increase at the wrong time, and would do so by creating for the Union a heads I win, tails you lose situation, by running a tainted election. If the Union won the election, the result would stand. If it lost, the election would be repudiated and the membership drive could continue unabated. We think the singling out of Simpson as the sole wrongdoer to be punished this way was unwarranted and improper, and as a prophylactic measure, we might well decline enforcement of the order even if otherwise warranted, to express our disapprobation of this procedure. This is the more indicated, since the Union has lost a third election and the only nonmoot issue is whether Simpson should post the prescribed notice. It was clearly unfair to Simpson employees not desiring Union representation to invite them to vote in an election when the NLRB would (unknown to them) nullify their votes if they proved to be in a majority, but effectuate a pro-union majority vote if that were to occur.

The ALJ's decision adopted by the board entirely fails to address either the employer's lack of knowledge of when the election would occur, as bearing on the employer's good faith, or the NLRB's selection of the closest possible election date as bearing on the genuineness of its belief that the election would be tainted and not reflective of the employees' true wishes.

Accordingly, in view of all circumstances, the petition for review is granted and the petition for enforcement is

Denied.