## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## WIS–PAK FOODS, INC., Respondent.

### No. 96–2912.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 18, 1997.

Decided Sept. 9, 1997.

Gary Shinners, National Labor Relations Board, Contempt Litigation Branch, Aileen A. Armstrong, John A. Mantz (argued), National Labor Relations Board, Appellate Court, Enforcement Litigation, Washington, DC, Philip E. Bloedorn, National Labor Relations Board, Milwaukee, WI, for Petitioner.

Thomas W. Mackenzie, Gary A. Marsack (argued), Lindner & Marsack, Milwaukee, WI, for Respondent.

Before ESCHBACH, EASTERBROOK, and DIANE P. WOOD, Circuit

DIANE P. WOOD, Circuit Judge.

Elections to determine whether a union will represent employees at a particular company or facility differ in a number of respects from ordinary political elections. Most importantly, because of its concern that the employer's inherent economic advantage may distort employee choice, the National Labor Relations Board has long been of the view that the election process itself must be more pristine than its political counterpart. The phrase "laboratory conditions" may connote an impossibly sanitized environment, but the concept of an election environment protected from unfair labor practices remains central to labor law. See generally *Overnite Transp. Co. v. N.L.R.B.*, 104 F.3d 109, 112–13 (7th Cir.1997); *Cross Pointe Paper Corp. v. N.L.R.B.*, 89 F.3d 447, 451–52 (7th Cir. 1996). In this case, the Board found that Wis–Pak Foods, Inc., engaged in a variety of unfair labor practices during and immediately after an election at its Butler, Wisconsin,

plant that required the election results to be set aside and a new election to be ordered. Bearing in mind the deferential standard of review we apply to the Board's findings, we conclude that its order here should be enforced.

**I**

Wis-Pak supplies hamburger patties to fast-food operators like Burger King, one of its principal customers. Although it once had five separate facilities, all of its operations during the times relevant to this proceeding were conducted from its Butler, Wisconsin, plant. In the summer of 1994, the Teamsters Union began an organizing drive at the plant. Wis–Pak did not welcome these efforts. Its president, Justin Segel, responded with an anti-Teamsters speech in August of 1994. Some time in September of 1994, apparently unbeknownst to Wis–Pak, the Teamsters were approached by the United Food and Commercial Workers of America, Local 73A (UFCW), which asserted that it had proper jurisdiction to organize the Wis–Pak employees.

The Teamsters acquiesced in the UFCW claim, and, on October 2, 1994, the Teamsters and the UFCW held a joint meeting for Wis–Pak employees at which they explained that the UFCW would take over the organizational campaign. Approximately 65–70 employees attended that meeting. The UFCW distributed Local 73A authorization cards at the meeting and afterwards; by October 12, 1994, it had gathered cards from 79 of the 226 employees in the bargaining unit. On October 10, 1994, Local 73A passed out leaflets at the plant announcing a meeting for October 12. The UFCW filed a petition for an election with the Board on October 14, 1994. The election, which took place on December 15, 1994, resulted in a 113 to 77 loss for the union. The UFCW then filed its unfair labor practice charges and objections to the election with the Board.

The union's objections included five key actions of Wis–Pak that it claimed were unfair labor practices, in violation of § 8(a)(1) of the National Labor Relations Act (NLRA),

29 U.S.C. § 158(a)(1), all of which unfairly tainted the election process:

(1) On October 12, 1994, Wis–Pak made changes in its overtime policy that were favorable to the employees, with an effective date of October 17, 1994.

(2) Company president Segel promised employees a wage increase at a general meeting on November 8, 1994.

(3) Sometime in mid-November 1994, Frank Unser, a shift supervisor, told employee Christine Cumming that she should not speak in favor of the union.

(4) In early December 1994, just a few days before the election, Wis–Pak changed its attendance policy so that it did not penalize emergency absences.

(5) On January 22, 1995, while UFCW's objections to the election were still pending, Wis–Pak granted a 5.4% wage increase to its production workers.

The Administrative Law Judge found in the union's favor on each of these points, and the Board agreed with him. Before this court, Wis–Pak argues that the first four findings were not supported by substantial evidence, that the record as a whole does not support the remedy of setting aside the election, and that the January 1995 wage adjustment was not unlawful under the Board's standards announced in *Marine World U.S.A.*, 236 NLRB 89, 90, 1978 WL 7681 (1978), supp. by 251 NLRB 1211, 1980 WL 12323 (1980).

## II

■ In 1964, the Supreme Court unanimously held that § 8(a)(1) of the NLRA prohibits an employer from conferring economic benefits on its employees shortly before a representational election, where the employer's purpose is to affect the outcome of the election and thus to interfere with the employees' free exercise of their right to organize under § 7 of the NLRA, 29 U.S.C. § 157. *N.L.R.B. v. Exchange Parts Co.*, 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964). As Justice Harlan put it in his opinion for the Court upholding the Board's finding of a violation of § 8(a)(1), "[t]he danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove. Employees are not likely to miss the inference

that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged." *Id.* at 409, 84 S.Ct. at 459.

The timing of the economic benefit is important. In *Ideal Elec. & Mfg. Co.*, 134 NLRB 1275, 1278 (1961), the Board identified a "critical" time period for identifying conduct that can be reviewed in connection with representational elections. The critical period generally runs from the day on which the election petition is filed until the day of the election. The Board focuses on this time period because it believes that the possibility of improper coercion or influence on employee choice is then at its highest, thus justifying special scrutiny of employer actions. See *id*; see also *Uniroyal Tech. Corp. v. N.L.R.B.*, 98 F.3d 993, 996–97 (7th Cir.1996) (noting the Board's critical period approach); *National By–Products, Inc. v. N.L.R.B.*, 931 F.2d 445, 452 (7th Cir.1991) (noting the relevance of the critical period to determining the effect of coercion on union elections). The Board may on occasion, however, take into account actions occurring outside the critical period, to the extent that they add meaning or context to the days and weeks leading up to the election. See, *e.g.*, *Fruehauf Corp.*, 274 NLRB 403, 411–12 (1985).

■ In this case, Wis–Pak took a number of steps during and close to the critical election period that the Board found amounted to violations of the Act. As we have repeatedly stated, we review the Board's findings of fact and its applications of law to fact to see if "they are supported by substantial evidence on the record considered as a whole." *E.g.*, *Overnite Transp. Co.*, 104 F.3d at 112; *Uniroyal*, 98 F.3d at 997–98. However sincerely one party or the other may believe that the Board or its administrative law judge should not have believed certain witnesses or should have placed greater weight on certain evidence, it is simply not our role to second-guess these kinds of determinations. It is this allocation of authority between administrative tribunal and appellate court that dooms so many appeals from Board decisions, not the utter inability of the losing party before the Board to make out a

plausible case for its side. Our review of the unfair labor practices alleged in this case must be understood in that light.

### A. Change in Overtime Policy

■ Before the union organizing efforts began at Wis-Pak, the company's overtime policy required employees to work at least 40 hours during the week before overtime pay would begin. In August of 1994, company president Segel learned that this policy was unpopular with some employees because when the week contained a holiday, Saturday work counted toward the first 40 hours rather than overtime. Wis–Pak officially changed the overtime policy on October 12, 1994, with an announced effective date of October 17, 1994, so that employees would be allowed to count holidays as "hours" toward the 40–hour basic workweek when computing overtime.

Segel explained to the ALJ that the timing of the change was influenced by the Teamsters' organizing campaign. He said that he had been persuaded by the employees' complaints that modification was necessary, but that on advice of counsel he had refrained from doing anything until he was sure the Teamsters were out of the picture. The General Counsel put a different face on the reform. UFCW organizer Ike Edwards testified about the October 2, 1994, joint Teamsters/UFCW meeting where the two unions informed the group that the Teamsters were passing the baton to the UFCW. Segel himself testified that he had received word through the employee grapevine that the Teamsters had backed away from the campaign. In addition, an outline of his November 8 speech announcing the change (submitted by General Counsel as an exhibit) indicated that Segel said, "We also changed the overtime policy so someone who is on a personal or vacation day during the week, and works on Saturday still receives the overtime pay. . . . All this was accomplished without a union—who needs them."

Based on this testimony and other evidence in the record, the ALJ wrote "I am convinced that [Wis-Pak] knew about the union organizational campaign from its genesis." He also found that "[t]he fact that

Segel used the change in overtime as an example of [Wis–Pak's] beneficence in order to persuade employees to vote against the Union is explicative of his purpose in making the change," making it clear that this finding rested on his assessment of Segel's credibility. The Board expressly accepted the ALJ's credibility findings on this matter. Its only additional comment related to Wis–Pak's argument that the overtime policy change did not occur during the critical period because it was announced two days before the union filed for an election. The Board acknowledged that fact, but it agreed with the ALJ that the actual change was not made effective until after the petition was filed and was therefore objectionable. See *Wis–Pak Foods, Inc.*, 319 NLRB 933, 933 n. 2, 1995 WL 738975 (1995).

Wis–Pak argues on appeal that there was absolutely no evidence to support a finding that Segel knew about the UFCW organizing effort, and there was evidence that supported Segel's version of events (principally from Kathy Kirst, Wis–Pak's Human Resources Manager). But the ALJ and the Board were entitled to conclude, from the testimony indicating that Segel knew about the October 2 meeting insofar as it finalized the Teamsters' withdrawal from the plant, that he also knew that the UFCW was taking over and handing out authorization cards. Furthermore, the ALJ noted that an official from Wis–Pak intercepted a UFCW organizer who was leafleting at the plant gate, called the police, and evicted him. This incident also supported the Board's finding that Segel knew what was afoot. Last, Segel's own comment during the election period linking the change in policy to the need for a union was evidence on which the Board could properly rely. We therefore find no reversible error in the Board's finding that the October 17 change in the company's overtime policy amounted to a violation of § 8(a)(1).

### B. Promised Wage Increase

■ At the same meeting on November 8, hourly employee Willie Chison asked Segel why maintenance workers had received wage increases while production workers had not. Like many other incidents in this case, Se-

gel's response was the subject of disputed testimony. Segel himself testified that he recalled Chison's inquiry and that he responded as he always did during the campaign by saying that the company, in keeping with its past practices, would review wages in January. Chison's account of the exchange was different:

> I had asked him about raises that maintenance got and I explained to him about sibling rivalries, that if one person in the family got a bicycle or a piece of cake the rest of them should get a bicycle or piece of cake too. Otherwise you had a problem with the rest of the employees. *And he said that we'll take care of the other part of you—that we would get a raise. I asked about the amount but I didn't get an amount on that and I didn't get a date on when maintenance got a raise, but he told us that the rest of the plant would get a raise after the first of the year.*

(Emphasis added.)

Wis–Pak is highly critical of the ALJ's decision to credit Chison's version of the conversation rather than Segel's. It insinuates that the ALJ was simply biased against Segel and for that reason alone did not accept his testimony at face value, although it offers absolutely no evidence to support this implicit charge other than the fact that it did not prevail in the proceeding and it thinks its evidence was stronger. It urges us to second-guess the ALJ's credibility call, professing an inability to understand why Segel would suddenly depart from his normal practice of refusing to answer specific questions about wages. The ALJ and the Board, however, thought the answer was simple: he departed because Wis–Pak was in the middle of an organizational campaign and the production employees were angry that they had not been treated as favorably as the maintenance employees. The ALJ further concluded that Chison was not sophisticated enough to make up the story, while Segel's testimony as a whole was carefully tailored to fit the company's defense to the charges. From where we sit, this round must go to the ALJ and the Board. If believed, Chison's testimony shows that Wis–Pak (through Segel) promised a raise during the critical period.

The Board itself specifically stated that "[i]n adopting the [ALJ's] finding that the Respondent violated § 8(a)(1) when Chief Operating Officer Segel promised production employees a wage increase, we rely only on employee Willie James Chison's credited testimony about Segel's statements to employees." *Wis–Pak Foods, Inc.*, 319 NLRB at 933 n. 2. Because the evidence shows that Wis–Pak promised the raise, and such a promise qualifies as an unfair labor practice under *N.L.R.B. v. Colonial Haven Nursing Home, Inc.*, 542 F.2d 691, 700 (7th Cir.1976), we see no reversible error in the Board's decision on this point.

### C. Instruction Not To Speak In Favor of the Union

As with the promised wage increase, the ALJ's and Board's finding on the disputed question whether a supervisor instructed an employee not to speak out for the union turns entirely on credibility determinations. Employee Christine Cumming testified that in mid-November, she was called into supervisor Frank Unser's office, where supervisor Rich Kirby was also present. When she asked what she had done, Unser took her into the human resources office and asked her what she had said to another co-worker. When she replied that she had simply commented that she had heard that there were enough votes for a union election, she testified that Unser responded as follows:

> Well, you shouldn't talk about union. Look what is going on with Briggs and Stratton. Look at all the other companies that were in a union, how many are closed down and on strike. This place had a union and it didn't work for them so let's not talk about the union. Talk about going against the union.

Recognizing the damaging nature of this testimony, Wis–Pak's principal argument is that Cumming was lying and the conversation never took place. Kirby's testimony tended to support that view, insofar as he stated that he did not recall such a conversation. Unser, however, did not testify. Wis–Pak gets nowhere with this argument, of course, because the ALJ was entitled to credit Cumming over Kirby and the absent Unser.

As a back-up argument, Wis–Pak claims that if any such conversation occurred, Unser was simply stating his opinion about the union in a noncoercive manner, and was thus within bounds even for an election period. See *E & L Transp. Co. v. N.L.R.B.*, 85 F.3d 1258, 1273 (7th Cir.1996) (mere statements of opinion do not violate the NLRA unless they were coercive in context). See also *N.L.R.B. v. Gissel Packing Co.*, 395 U.S. 575, 616–20, 89 S.Ct. 1918, 1941–43, 23 L.Ed.2d 547 (1969). The employer's subjective intent and the employee's subjective reaction, however, are not dispositive. Instead, the question is whether the employee who heard the contested statement could have been coerced by it into opposing the union. See *E & L Transp. Co.* at 1273–74; *Helena Lab. Corp.*, 228 NLRB 294, 295, 1977 WL 8403 (1977). Cumming herself testified that she did not feel intimidated by the two supervisors and that she regarded the discussion more like an exchange of opinions. On the other hand, she was summoned into Unser's office only a short time after she discussed the union with her co-worker, Unser's mention of other plant closings implied that her support of the union placed her job at risk, and Kirby (jokingly, according to Cumming) told her that she would be in trouble if she spoke out in favor of the union again.

This incident presents a close call. The ALJ, relying on *Helena Lab. Corp., supra,* concluded that the objective factors suggesting coercion were more important than Cumming's after-the-fact account of her state of mind. This general approach to the protection of § 7 rights has a reasonable basis in the law, and Wis–Pak concedes that it is correct. See *N.L.R.B. v. Illinois Tool Works*, 153 F.2d 811, 814 (7th Cir.1946) (noting that the test for violations of § 8(1), now codified as § 8(a)(1), of the NLRA is whether "the employer engaged in conduct which, it may reasonably be said, tends to interfere with the free exercise of employee rights under the Act," and that actual or successful coercion need not be shown in order for the Board to find a violation). See also *N.L.R.B. v. General Thermodynamics, Inc.*, 670 F.2d 719, 721 (7th Cir.1982) (quoting and following *Illinois Tool Works*). Once we accept Cumming's account of the conversation, the rec-

ord shows that Unser made remarks that implied job loss (hence a threat of reprisal, cf. *E & L Transp. Co.*, 85 F.3d at 1273) and that called for restrictions on pro-union activity and encouragement of anti-union activity. Under the circumstances, the governing standard of review once again requires us to uphold the Board's decision.

### D. Change in Attendance Policy

The alleged unfair labor practice relating to the attendance policy occurred in early December 1994, days before the election. Prior to the election, Wis–Pak had relied on a long-standing "no fault" attendance policy under which "points" were charged to the employee's record for all unexcused tardies or absences. When the number of points reached a certain level, the policy provided for various forms of disciplinary action. On the other hand, employees with good attendance records could have prior points erased from their record based on how long they had gone without accruing new points. There had been some question, however, over how to treat absences caused by emergencies. A number of employees believed that they could receive points even in these cases. Wis–Pak manager Linda Korbar testified that during the election period employees often complained that the attendance policy was unfair because it did not classify family emergencies (like a child's illness or injury) as an excusable ground for absence. (Neither side has mentioned any effect that the Family and Medical Leave Act of 1993, codified at 29 U.S.C. § 2601 *et seq.*, might have on this question, so we too leave that to one side.) When such questions arose, Korbar reassured employees that this kind of emergency absence would also be excused.

At a company campaign meeting held in early December, employee Montel Joyner asked Segel to explain the absentee policy. Segel declined to do so, but, according to Joyner, about two hours later Korbar called Joyner into her office and told him that the attendance policy had been changed so that employees would not receive points for absences caused by documented emergencies. Joyner claimed Korbar encouraged him to

"spread the word," because although the policy had been changed the company could not post the new version. Korbar, on the other hand, initially said that she had no recollection of a conversation with Joyner on that occasion, and she later flatly denied his allegations.

The ALJ credited Joyner's testimony over Korbar's and found that Korbar's acts amounted to an unfair labor practice because she gave the employees "a reason to believe that the attendance policy would be administered in a more lenient and humane manner in the future." Once again, this was a promise of a benefit made at a particularly sensitive time during the run-up to the election, and as such, it was an unfair labor practice. Wis–Pak points out that the ALJ did not explain why he chose to believe Joyner rather than Korbar, but offers little more in the way of argument. The mere fact that the company may have refrained from assessing points for emergency absences in the past on an *ad hoc* basis does not refute the ALJ's finding of a significant change. The shift to a clear entitlement not to have points assessed for emergencies represented a distinct improvement for the employees, as the ALJ and the Board found.

### E. *January 1995 Wage Increase*

 Last, we consider Wis–Pak's post-election grant of a 5.4% wage increase to all production employees on January 22, 1995. There is no dispute that it implemented the increase; the question is rather whether the increase was motivated by an intent to erode union support (in which case the Board was entitled to find that it was another unfair labor practice) or if it was granted pursuant to settled practice (in which case it was lawful). The critical period for the election had long since expired, since the election itself was held more than a month before the date of the increase. On the other hand, UFCW's objections to the election were still pending, which meant that the possibility of a second election had not been foreclosed. Benefits conferred to erode union support in the event of a second election may also constitute an unfair labor practice, as we held in *N.L.R.B. v. Gruber's Su-*

*per Market, Inc.*, 501 F.2d 697, 702–03 (7th Cir.1974). The question is therefore whether the ALJ's conclusion that the increase was in fact so motivated, and was not conferred in the ordinary course of business, was supported by substantial evidence.

Before the ALJ, the General Counsel argued that the January wage increase was granted to fulfill the promise Segel made in the November meeting in response to Chison's question and to dissuade employees from voting for the union in case a second election was ordered in response to the union's objections. To support that theory, he offered evidence showing that Wis–Pak had given no wage increases at all in 1987, 1989, 1990, 1991 and 1993, and it had given increases of only 3% in 1992 and 1994, rather than the generous 5.4% conferred in 1995. He also offered testimony from Kenneth Glinski, Wis–Pak's Director of Human Resources, who admitted that he had determined that only a 4% wage increase was necessary to maintain a competitive salary. Glinski had accordingly recommended to management that the increase be limited to 4%.

Once again, Wis–Pak responded with a plausible story of its own. Segel testified that the company gave no raises in 1989, 1990, and 1991 because of its poor financial health, as evidenced by its closing of several branch facilities. Korbar had written a report in November 1993 that recommended a wage increase of 3% to stem the rate of employee turnover, which was considerable and growing according to the following figures from Wis–Pak:

1990 turnover rate: 23.4%

1991 turnover rate: 32.0%

1992 turnover rate: 32.5%

1993 turnover rate: 45.7%

1994 turnover rate: 78.0%

Finally, Wis–Pak presented testimony from Segel and Glinski that in January 1995, concerned by the high turnover rate, management decided to increase wages to $8.00 per hour, which translated into the 5.4% increase it adopted.

At best, we have two conflicting explanations for the January increase. Furthermore, on this record it is very hard to tell

what Wis–Pak's turnover figures really mean. At oral argument, the panel attempted to find out if the record contained any evidence about comparable turnover rates for Wis–Pak's industry, training times, or other information that would put this in some perspective. The answer was no. If all of Wis–Pak's competitors were also observing increasing turnover rates of comparable magnitudes, that would suggest some external cause, such as improved economic opportunities elsewhere or tightened enforcement of immigration laws. With no evidence of this type, we are left with the fact that Wis–Pak gave a wage increase that was either 135% of the amount recommended by the Director of Human Resources or 180% of the highest recent increase, at a time when the union was actively pursuing its unfair labor practice objections to the December election. Particularly against the background of Segel's earlier promise at the meeting to take exactly this kind of step, we are constrained again to uphold the ALJ's decision as adopted by the Board. See *LRM Packaging, Inc.*, 308 NLRB 829, 834 (1992) (noting that the test for whether a wage increase violates the NLRA is whether the increase was "calculated to impinge upon the employees' freedom of choice" in an upcoming or future union election), quoting *Marine World U.S.A.*, 236 NLRB at 90. Wis–Pak has not shown that its action was consistent with past practice; it makes no claim that it had decided prior to the onset of union activity to give such a generous pay increase to its employees in January of 1995; and the ALJ was not compelled to accept its argument that the action was due to a business justification.

Like many labor cases, this is one in which the events surrounding the election were contested and in which credibility decisions lie at the heart of the ALJ's conclusions. Even looking at the record as a whole, as Wis–Pak urges us to do, we conclude that the Board's decision was supported by substantial evidence and that its legal conclusions had a reasonable basis. We therefore ENFORCE the Board's order and dismiss Wis–

Pak's objections. Board's order and dismiss Wis–Pak's objections.