# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 03-3972

NATIONAL LABOR RELATIONS BOARD,

*Petitioner*,

and

GRAPHIC COMMUNICATIONS UNION,
FOX VALLEY LOCAL, 77-P, AFL-CIO, CLC,

*Intervening Petitioner*,

*v.*

CURWOOD INCORPORATED, a Division of
BEMIS COMPANY, INCORPORATED,

*Respondent.*

Application for Enforcement of an Order
of the National Labor Relations Board.
No. 30-CA-15245-1

ARGUED MAY 25, 2004—DECIDED FEBRUARY 9, 2005

Before EASTERBROOK, WOOD, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* An employer who learns its employees are contemplating unionization need not remain silent. It must proceed with caution, however, lest it violate the National Labor Relations Act ("NLRA"). In this case, Curwood, Inc. attempted to counter a union

campaign in part by promising improvements in pension benefits to employees in the voting unit. It also announced benefits to a small group of employees that were excluded from the unit. The National Labor Relations Board ("Board") ruled that these actions constituted several unfair labor practices, and the Board now seeks to enforce its order. With one exception, we grant the petition for enforcement.

## I. BACKGROUND

Curwood manufactures flexible film packaging for snack foods at three facilities in Oshkosh, Wisconsin collectively known as the South Campus. It also has other plants throughout the United States. Historically, the company had provided two different pension benefit plans for its South Campus employees: the Bemis Hourly Retirement Plan ("BHRP") applied to hourly employees, while salaried employees were covered by the Bemis Retirement Plan ("BRP"). In most circumstances, the BRP provided more generous pension benefits than did the BHRP.

In September 1997, Curwood informed its hourly employees that BHRP benefits would increase by certain amounts on January 1 over the following three years, including January 1, 2000. Employees, though, remained concerned about their pension benefits. In February or March of 2000, the Graphic Communications Union ("Union") began an organizing drive at the South Campus, and pension benefits were an important issue in the campaign.

When Curwood learned in March[1] that employees were distributing and signing union authorization cards, the company became concerned. On April 7, Curwood distrib-

---

[1] All references are to 2000 unless otherwise indicated.

uted a letter to its South Campus employees which began, "We are aware that union authorization cards are being circulated at the plants and at organizational meetings." The letter informed employees that the company had undertaken to "review and improve the current [pension] benefits effective January 2001," and it anticipated that pension improvements would be announced in the spring or summer of 2000. The letter concluded by urging employees not to sign union authorization cards. Curwood distributed another memorandum to its South Campus employees on May 1. This letter stated the company had compared the BRP and BHRP and concluded that the BRP would be an "improvement" over the BHRP.

A week later, on May 8, the Union filed petitions seeking to represent South Campus production employees. Several weeks later, Curwood notified South Campus employees in a letter dated May 30 that it was "pleased to announce" that the (more generous) BRP would be "implemented effective January 1, 2001." On June 12, Curwood distributed a memorandum announcing that its plan to transfer production and maintenance employees to the BRP had a target implementation date of January 1, 2001. The letter also stated that any changes the company might make to the BHRP while the representation petition was pending might violate the law.

On June 20, the Regional Director issued a decision and direction of election which scheduled an election for July 20-21. Although Curwood had taken the position that maintenance employees should be included in the voting unit, the decision excluded the maintenance employees from the unit. On July 13, one week before the election, Curwood distributed a letter announcing an increase in BHRP benefits to the now-excluded maintenance employees. Production employees found copies of this letter taped to their work areas and on bulletin boards and desks.

The Union lost the election by a vote of 386 to 257. It then filed objections and alleged Curwood had committed unfair labor practices. After a hearing, the administrative law judge ("ALJ") issued a decision finding that Curwood violated the NLRA and that the election should be set aside. The Board affirmed the ALJ's decision that Curwood committed unfair labor practices by: (1) announcing and promising benefits to discourage union support on April 7, May 30, and June 12; (2) blaming the union for the absence of further benefits on June 12; and (3) making an implicit promise on July 13 of enhanced transitional pension benefits. The Board then brought this action to enforce its order. The election objections are not before us.

## II. ANALYSIS

### A. Article III Case or Controversy

We must first assure ourselves that this matter presents a justiciable case or controversy within the scope of Article III, as it is "well-established that the existence of a case and controversy is a prerequisite for the exercise of federal judicial power under Article III." *Sprint Spectrum L.P. v. City of Carmel, Ind.*, 361 F.3d 998, 1002 (7th Cir. 2004). This limitation prohibits us from rendering opinions upon moot questions and from issuing advisory opinions. *See Worldwide Street Preachers' Fellowship v. Peterson*, 388 F.3d 555, 558 (7th Cir. 2004); *Wisconsin Right to Life, Inc. v. Schober*, 366 F.3d 485, 487 (7th Cir. 2004). Curwood contends that no case or controversy exists, maintaining that the Board's order does not require Curwood to take any affirmative action beyond the posting of a notice. It also contends that the matter is moot.

Because the Board partially modified the ALJ's recommended order, no single page in the Board's decision set forth the entire order. At our request, the Board submit-

ted a "clean copy" of its order after oral argument. In addition to posting a notice, the order also directs Curwood to cease and desist from certain unfair labor practices found by the Board, namely, from: "(a) Announcing and promising improvements in pension benefits in order to discourage union support"; "(b) Blaming the Union for the absence of further benefits"; and "(c) In any like or related manner interfering with, restraining, or coercing employees in the exercise of their Section 7 rights."

After reviewing this order, we are satisfied that the Board's request for enforcement does not seek an advisory opinion. A judgment is "advisory" only when it does not bind the unsuccessful litigant. *DeSilva v. DiLeonardi*, 125 F.3d 1110, 1113 (7th Cir. 1997). Our enforcement of a cease and desist order, however, serves to bind an employer. Enforcing such an order requires an employer to "conform his conduct to the norms set out in the Act." *Int'l Ladies' Garment Workers' Union v. N.L.R.B.*, 366 U.S. 731, 740 (1961). Notably, the failure to abide by a cease and desist order enforced by a court of appeals renders an employer subject to contempt penalties. 29 U.S.C. § 160(e), (f); *Sure-Tan, Inc. v. N.L.R.B.*, 467 U.S. 883, 904 n.13 (1984); *N.L.R.B. v. P\*I\*E Nationwide, Inc.*, 894 F.2d 887, 890 (7th Cir. 1990).

Furthermore, compliance with a Board cease and desist order does not render a cause moot. *N.L.R.B. v. Raytheon Co.*, 398 U.S. 25, 27 (1970); *N.L.R.B. v. Mexia Textile Mills, Inc.*, 339 U.S. 563, 567 (1950). After all, "[i]f a cease and desist order became moot by virtue of the respondent's discontinuing the specific illegalities that gave rise to the order, such orders would have no force at all—the respondent would comply for a day, declare the order moot, and resume its violations with impunity." *P\*I\*E Nationwide*, 894 F.3d at 892. Therefore, despite Curwood's protestations, the mere fact that the events giving rise to this proceeding are complete does not render

this matter moot. We recognize that the Supreme Court has noted that situations may exist where an enforcement proceeding becomes moot because no reasonable expectation exists that a wrong will be repeated, *Raytheon*, 398 U.S. at 27, but we have no reason to believe that this is such a case, as, assuming for the moment that an unfair labor practice did occur here, we simply cannot be assured that the acts will not be repeated again. The NLRA "is not designed merely to protect a particular election or organizational campaign," *Raytheon*, 398 U.S. at 27, and "the Board is entitled to have the resumption of the unfair practice barred by an enforcement decree." *Mexia Textile Mills*, 339 U.S. at 567. We regularly review cease and desist orders, *e.g.*, *Bloomington-Normal Seating Co. v. N.L.R.B.*, 357 F.3d 692 (7th Cir. 2004); *Fleming Companies, Inc. v. N.L.R.B.*, 349 F.3d 968 (7th Cir. 2003); *N.L.R.B. v. Cook County School Bus, Inc.*, 283 F.3d 888 (7th Cir. 2002), and, armed with the assurance that this order presents us with a justiciable case or controversy, we will proceed to do so here.

B.   Alleged Unfair Labor Practices

When reviewing a Board decision, we review factual findings to determine if they are "supported by substantial evidence on the record as a whole." *ATC Vancom of Cal., L.P. v. N.L.R.B.*, 370 F.3d 692, 695 (7th Cir. 2004) (citations omitted). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Am. Grain Trimmers, Inc. v. Office of Workers' Comp. Programs*, 181 F.3d 810, 817 (7th Cir. 1999) (en banc) (citations omitted). Our review of the Board's legal conclusions asks whether they have "a reasonable basis in the law." *ATC Vancom*, 370 F.3d at 695. Where the Board adopts the ALJ's findings of fact and conclusions of law, as here, it is the ALJ's determinations that we review. *SCA*

*Tissue N. Am. LLC v. N.L.R.B.*, 371 F.3d 983, 988 (7th Cir. 2004).

1.   Announcing benefits to production employees

Curwood first challenges the finding that its letters to production employees on April 7, May 30, and June 12 improperly promised benefits with the intention of interfering with employees' Section 7 rights. Section 7 of the National Labor Relations Act (29 U.S.C. § 157) provides employees with certain rights, including the right of self-organization and the right to form labor organizations. Section 8(a)(1) of the Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise" of their Section 7 rights. 29 U.S.C. § 158(a)(1).

The Supreme Court has interpreted Section 8(a)(1) to prohibit "conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect." *N.L.R.B. v. Exchange Parts Co.*, 375 U.S. 405, 409 (U.S. 1964). In holding unlawful an employer's grant of benefits in response to a union campaign, the Court reasoned:

> [t]he danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove. Employees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged.

*Id.*

Not all agree with the *Exchange Parts* premise that employees receiving benefits from an employer in response to a union campaign are "intimidated by the figurative 'fist inside the velvet glove.'" *Skyline Distribs. v. N.L.R.B.*,

99 F.3d 403, 408-10 (D.C. Cir. 1996) (discussing criticism of *Exchange Parts* ruling); *see, e.g.*, Derek C. Bok, *The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act*, 78 Harv. L. Rev. 38, 113-15 (1964). Curwood, however, is not one of *Exchange Parts*'s detractors.[2] Curwood agrees with the *Exchange Parts* premise but argues that only a benefit promised or conferred *after* a representation petition has been filed (i.e., during the "critical period") can constitute an unfair labor practice. Thus, Curwood reasons, because it sent the first letter at issue before the union filed a formal representation petition, the company's conduct cannot violate Section 8(a)(1). Our threshold question, then, is whether an employer's announcement of a benefit before a representation petition has been filed can ever violate Section 8(a)(1).

Curwood maintains that *Exchange Parts* resolves this question with a definitive "no," pointing to the following passage:

> We think the Court of Appeals was mistaken in concluding that the conferral of employee benefits *while a representation election is pending*, for the purpose of inducing employees to vote against the union, does not "interfere with" the protected right to organize.

*Exchange Parts*, 375 U.S. at 409 (emphasis added). Curwood contends that the Court's use of the phrase "while a representation election is pending" means that only the conferral or announcement of benefits *after* a representation petition has been filed can violate Section 8(a)(1). We do not agree that *Exchange Parts* stands for the bright-line rule Curwood advocates. Although that case held that announcing

---

[2] Even if Curwood disagreed with *Exchange Parts*, of course, it remains the law until the Supreme Court or National Labor Relations Board directs otherwise.

benefits after a petition was filed for the purpose of inducing employees to vote in favor of unionization was improper, the Court made no comment whatsoever as to the lawfulness of announcements that take place before the filing of a petition. Neither *Exchange Parts* nor *N.L.R.B. v. Wis-Pak Foods, Inc.*, 125 F.3d 518 (7th Cir. 1997), the other case on which Curwood relies, involved an alleged promise of benefits before a petition was filed.

After all, the alleged violation here is a violation of the National Labor Relations Act. Curwood is charged with interfering with rights employees possess under Section 7 of the Act. Yet nothing in the Act limits Section 7 rights to the critical period. Curwood acknowledges, as it must, that employees have Section 7 rights at all times. There is simply nothing in Sections 7 or 8(a)(1) of the Act that conditions the finding of an unfair labor practice on the date when a representation petition is filed, and Curwood can point us to no line of cases that condition an employee's Section 7 rights on this date. *Cf. Technodent Corp.*, 294 NLRB 924 (1989) (issuing new employee handbook to discourage union activity, before petition filed, supported § 8(a)(1) violation); *Lomasney Combustion, Inc.*, 273 NLRB 1241 (1984) (interrogation before petition filed).[3] It would seem odd indeed to allow an employer to trample over an employee's Section 7 rights with impunity, so long as it does so the day (or minute) before the representation petition is filed.

---

[3] We recognize that when analyzing objections to elections, the Board has stated a showing must exist that the alleged objectionable conduct took place during the critical period. *Gibraltar Steel Corp.*, 323 NLRB 601, 603 (1997). The test for whether conduct interferes with the "laboratory conditions" for an election, however, "is considerably more restrictive than the test of conduct which amounts to interference, restraint, or coercion which violates Section 8(a)(1)*," Dal-Tex Optical Co.*, 137 NLRB 1782, 1786-87 (1962), and the election proceeding is not before us.

Rejecting a rigid dichotomy that would prevent us from even considering whether increasing benefits before the critical period violates Section 8(a)(1) is consistent with the approach taken by our sister circuits and the Board itself. *See, e.g.*, *N.L.R.B. v. Rich's of Plymouth, Inc.*, 578 F.2d 880, 883 (1st Cir. 1978) (pre-petition promise of benefit unlawful); *N.L.R.B. v. Fremont Mfg. Co.*, 558 F.2d 889, 891 (8th Cir. 1977) (finding improper pre-petition grant of benefits conferred soon after employer learned employees were distributing authorization cards); *N.L.R.B. v. WKRG-TV*, 470 F.2d 1302, 1306-07 (5th Cir. 1973) (pre-petition promise of benefits unlawful); *Agrigeneral Co.*, 320 NLRB 943 (1996) (same); *Triec, Inc.*, 300 NLRB 743 (1990), *enf'd*, 946 F.2d 895 (6th Cir. 1991) (Table) (finding pre-petition announcement and implementation of benefits unlawful after employer learned employees had signed authorization cards); *Sarah Neuman Nursing Home*, 270 NLRB 663, 663, 678 (1984) (announcing benefits before petition filed to influence election unlawful).

We reject Curwood's contention that *Exchange Parts* applies only to employer grants, promises, or announcements of benefits made after a representation petition was filed. Of course, not all announcements or promises of benefit are unlawful. Such promises or grants are unlawful only when done in order to discourage employee support of a union. *Van Vlerah Mech., Inc. v. N.L.R.B.*, 130 F.3d 1258, 1262 (7th Cir. 1998); *Wis-Pak Foods,* 125 F.3d at 521. Thus, for example, an employer does not commit an unfair labor practice when it is merely following an established practice of pay raises predating a union campaign, or when it has some other "union-neutral justification" for the increase. *N.L.R.B. v. Don's Olney Foods*, *Inc.*, 870 F.2d 1279, 1285 (7th Cir. 1997). Curwood, however, acknowledged that it sent the April 7, May 30, and June 12 letters to discourage its employees from supporting the union, and it did not argue to us that it sent the letters

for a "union-neutral" reason. Rather, it rested its case on its erroneous contention that only post-representation promises of benefits can be unlawful.

We will nonetheless briefly address why the Board was justified in finding that Curwood's purpose interfered with its employees' Section 7 rights. We first turn to the April 7 letter. In the very first sentence, Curwood said to its employees, "We are aware that union authorization cards are being circulated." It then declared, for the first time, that it anticipated pension improvements would be announced later in the spring or summer, and benefits would continue to be made without union intervention. This letter marked the first time that Curwood had announced a pension improvement since 1997. The text of the letter makes clear that Curwood promised these benefits precisely because the union was organizing, a point with which Curwood does not quarrel.

Curwood sent the May 30 and June 12 letters after the union filed its representation petition on May 8. Curwood reasoned that these letters merely reiterated the lawful (so it argued) pre-petition announcement of benefits contained in the April 7 letter. Because we agree that substantial evidence supports the finding that the promise of benefits contained in the April 7 letter violates Section 8(a)(1), Curwood's argument with respect to the May 30 and June 12 letters fails. Both the May 30 and June 12 letters further elaborate on the new pension benefit plan. The May 30 letter marked the first time Curwood announced to bargaining unit employees that they would be transferred into the BRP effective January 1, 2001, and the June 12 letter explicitly stated the new benefit was "clearly an improvement" to the employees' current retirement benefit. Moreover, Curwood did not argue to us that it had made a decision to implement these benefits before the union activity began or that

it would have taken the same action in the absence of union activity for some other reason. We thus find that substantial evidence supports the Board's finding that the April 7, May 30, and June 12 letters constituted unfair labor practices.

## 2.   Blaming the union for the absence of future benefits

We also agree that substantial evidence supports the Board's finding that Curwood's June 12 letter unlawfully blamed the Union for the company's inability to grant benefits. During a union organizing campaign, an employer is to conduct "business as usual" with respect to its benefits decisions. *Beverly California Corp. v. N.L.R.B.*, 227 F.3d 817, 839 (7th Cir. 2000). Blaming a union for an employer's refusal to improve benefits during a union organizing drive violates Section 8(a)(1). *N.L.R.B. v. Ind. Erectors*, *Inc.*, 712 F.2d 1131, 1135 (7th Cir. 1983); *Miller Waste Mills*, *Inc.*, 334 NLRB 466, 467-69 (2001), *enf'd*, 315 F.3d 951 (8th Cir. 2003); *Seda Specialty Packaging Corp.*, 324 NLRB 350, 351 (1997).

Curwood's June 12 letter to employees stated in part:

> Because of the pending petition, federal labor law restricts our ability to change, add to or subtract from the various components of both the BHRP, as well as the BRP. For example, while no one can debate the advantages of adding additional dollars to the current BHRP funding level, for the Company to make such changes, while the petition is pending, the law may be violated. If an increase is warranted, then the Company would be restricted from making such an improvement at this time.

Curwood contends that this letter constituted protected free speech, *see* 29 U.S.C. § 158(c)(1), and merely conveyed a correct statement of the law to its employees. While it is true that under some circumstances, an employer can

postpone a benefit increase decided on before a union campaign, it can only do so if "it '[makes] clear' to employees that the adjustment would occur whether or not they select a union, and that the 'sole purpose' of the adjustment's postponement is to avoid the appearance of influencing the election's outcome." *KMST-TV, Channel 46*, 302 NLRB 381, 382 (1991) (quoting *Atlantic Forest Prods., Inc.*, 282 NLRB 855, 858 (1987)); *accord Simpson Elec. Co. v. N.L.R.B.*, 654 F.2d 15, 17 (7th Cir. 1981); *Noah's Bay Area Bagels, LLC*, 331 NLRB 188, 190-91 (2000). Here, though, Curwood was not "postponing" a benefit increase. As we have already discussed, Curwood's announcement of improved pension benefits came only after it learned of union organization activity. Curwood does not contend that it had already decided to increase BHRP funding before the union campaign or that it was simply postponing a regularly scheduled increase. This is not a case where an employer discussed benefits that were normally due and then carefully told its employees it needed to postpone them in order to avoid the appearance of election interference. Rather, Curwood raised the possibility of new benefits while a petition was pending, and then blamed the union for its inability to provide them. Therefore, we conclude that the Board was entitled to find that the June 12 letter improperly blamed the presence of the union for its inability to increase benefits.

### 3.   Letter to non-unit employees

Finally, we turn to Curwood's announcement to maintenance employees. Only production employees were to vote in the election scheduled to begin July 20; maintenance employees had been specifically excluded from the voting unit. On July 13, 2000, in a document addressed to only the non-voting maintenance employees, Curwood announced a "transitional BHRP benefit improvement" for maintenance

employees. The Board affirmed the ALJ's conclusion that this announcement violated Section 8(a)(1) as an improper implied promise that the same benefits would come to production employees if they rejected the union.[4] The Board urges us to uphold this finding but does not cite any authority to support its position.

To the extent the Board's position is that if a union attempts to organize one group of workers, any increase or announcement of an increase in benefits to any other group of workers automatically constitutes an unlawful labor practice, we reject it. The Board's decision in *Springfield Jewish Nursing Home for the Aged, Inc.*, 292 NLRB 1266 (1989), is instructive. There, an administrative law judge ruled that an employer violated Section 8(a)(1) by granting wage increases to nonbargaining unit nurses prior to an election in order to influence bargaining unit employees and to dissuade them from voting in favor of the union. In reasoning similar to that of the ALJ here, the ALJ in *Springfield Jewish Nursing Home* reasoned, "The fact that this increase was given only to selected nonunit personnel is quite immaterial, because it was clear that news of the Respondent's willingness to address an internal pay inequity at issue in the campaign would filter through to bargaining unit employees, and in fact it did." *Id.* at 1273-74. The Board, however, disagreed. It ruled that the record supported the employer's contention that it promulgated the increase to remain competitive within its market, stating "we cannot find that the Respondent increased the wages of nonunit employees to discourage employees within the bargaining unit from joining, supporting, or assisting the Union." *Id.* at 1266.

---

[4] As the ALJ noted, the Board's General Counsel did not allege that the July 13 announcement constituted an unlawful discriminatory grant of benefits.

As is the case with voting unit employees, then, an increase in benefits to nonunit employees before an election is not *per se* unlawful. Indeed, the Board has stated that "[a]bsent an unlawful motive, an employer is privileged to give wage increases to his unorganized employees, at a time when his other employees are seeking to bargain collectively through a statutory representative." *Empire Pacific Inds.*, 257 NLRB 1425, 1427 (1981) (citation omitted); *see also Overnite Transp. Co.*, 280 F.3d 417, 431 (4th Cir. 2000) (stating, in collective bargaining context, "there is no duty to grant to union employees every benefit that is granted to non-union employees"); *Sun Transp., Inc.*, 2003 WL 22102496, at *4 (N.L.R.B. 2003) ("the Board has long held that employers may offer different benefits to represented and unrepresented groups as part of its bargaining strategy.")

We reject any contention that granting benefits to non-unit employees during a union organizing campaign is *per se* an unfair labor practice. Similarly, the announcement of increased benefits to non-unit employees, standing alone, cannot violate Section 8(a)(1). It would make no sense to say that an employer could grant benefits to non-unit employees, but it could not tell them.

The test for determining whether an employer violates Section 8(a)(1) asks whether the employer's conduct had a reasonable tendency to interfere with or coerce employees in the exercise of their Section 7 rights. *Multi-Ad Servs., Inc. v. N.L.R.B.*, 255 F.3d 363, 372 (7th Cir. 2001); *N.L.R.B. v. Joy Recovery Tech. Corp.*, 134 F.3d 1307, 1313 (7th Cir. 1998). There is no contention in this case that Curwood interfered with its maintenance employees' rights. Here, then, the proper analysis must ask whether Curwood's letter to non-voting maintenance employees had a reasonable tendency to interfere with the *production* employees' rights to self-organization and to form labor organizations.

We are concerned that the language of the Board's order and ALJ's ruling adopted by the Board may not be consistent with this analysis. As they currently stand, a reader may take either or both to mean that any increase in benefits to non-unit employees during a union campaign, or the announcement of such benefits to non-unit employees, is *per se* unlawful. As we discussed, this cannot be the case. We will thus remand this matter for clarification in light of our opinion.

On remand, the Board may still find that the letter to maintenance employees had a reasonable tendency to interfere with the production employees' exercise of their Section 7 rights. The ALJ had pointed to the letter's timing one week before the election, a finding that it was "widely distributed," and the testimony of a management employee that he knew the letter was likely to be widely distributed. Furthermore, unlike the employer in *Springfield Jewish Nursing Homes*, Curwood did not argue to us that its grant was justified by a legitimate business reason, and Curwood knew that pension benefits were an important issue in the campaign. On the other hand, the letter was addressed only to maintenance employees, it did not mention the union, and there is no evidence in the record that production employees were responsible for the letter's distribution. In addition, the ALJ stated in his reasoning that Curwood did nothing to limit dissemination of the announcement, but the Curwood Vice President for Human Resources testified that the letter was given to maintenance employees directly, and the same employee on whom the ALJ relied testified that the letters he saw posted in the production employees' area had been taken down by the next night.

Even if the July 13 letter had a reasonable tendency to interfere with production employees' Section 7 rights, we are concerned that the language of the Board's order may be misinterpreted. We recognize that the Board's choice

of remedy is entitled to deference. *N.L.R.B. v. Aluminum Casting & Eng'g Co.*, 230 F.3d 286, 295 (7th Cir. 2000). That remedy, however, must be tailored to fit the unfair labor practice it is intended to redress. *Id.* (citations omitted). Although the Board found unfair labor practices based on announcements of benefits to both unit and non-unit employees, the relevant portion of the Board's order as it currently stands contains only a blanket statement directing Curwood to cease and desist from "Announcing and promising improvements in pension benefits in order to discourage union support." No distinction is drawn between the announcement of benefits to the voting production employees and the announcement of benefits to non-voting maintenance employees. We are concerned that later, when the order is posted, a reader might take it to mean that a company cannot give or announce any increase in benefits to maintenance employees. Again, interference with maintenance employees' Section 7 rights is not at issue. The order, however, does not make clear that announcing benefits to maintenance employees is unlawful only when done in a manner that will coerce production employees. Therefore, with respect to the Board's finding that the July 13 letter to maintenance employees constituted an unfair labor practice, we remand to the Board for reconsideration and clarification of its opinion and order in light of our discussion.

### III. CONCLUSION

For the foregoing reasons, the order of the Board is ENFORCED in part and VACATED in part, and the matter is REMANDED to the Board for further proceedings consistent with this opinion.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*