**OWENS–CORNING FIBERGLAS COR-PORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 12622.

United States Court of Appeals
Fourth Circuit.

Argued Dec. 4, 1968.

Decided March 17, 1969.

Wm. H. Smith, Jr., Alexandria, Va. (Smith & Smith, on brief), for petitioner.

Marjorie S. Gofreed, Attorney, N.L.R.B. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and John D. Burgoyne, Attorney, N.L.R.B., on brief), for respondent.

Before BRYAN, CRAVEN and BUTZNER, Circuit Judges.

CRAVEN, Circuit Judge:

This case comes before us on cross-petitions for review and enforcement of a decision and order of the National Labor Relations Board against Owens-Corning, 172 N.L.R.B. 20 (1968). The Board found the company to have granted employee benefits prior to a Board election in violation of § 8(a) (1) of the Act and to have discharged two employees in violation of § 8(a) (1) of the Act.[1]

On August 15 and 16, 1967, pursuant to a representation petition filed by the Glass Bottle Blowers Association, an election was held at the company's Aiken, South Carolina, plant. There were three choices on the ballot: the Glass Bottle Blowers, the Teamsters, and "no union," none of which received a majority. In such situations § 9(c) (3) of the Act[2] and § 102.70(a) of the Board regulations[3] require that a runoff election *shall* be conducted to determine the winner. The company, on August 23, filed objections to the August 1967 election based on conduct of the Teamsters Union which the Regional Director rejected, and the Board directed that a runoff election be held on February 13 and 14, 1968, between the Teamsters Union and the "no union" choice. Charges which resulted in the decision and order of the Board presently before us were filed October 16, 1967. The Teamsters lost the February 1968 election by a narrow margin and on September 19, 1968, the Board sustained Teamster objections and directed a second runoff election, which election, we were informed in open court by counsel for the company, resulted in a "no union" majority.

The petitions here for review and enforcement deal with events which took place immediately after the August 1967 election before the first runoff election had been scheduled for February of the following year. The company contends that none of the § 8(a) (1) violations found by the Board are supported by substantial evidence and that the § 8(a) (1) violations stemming from company grants of benefits prior to the election are not supported by the pleadings. We disagree and enforce the Board order.

I.

## THE GRANT OF BENEFITS PRIOR TO THE BOARD ELECTION

The Trial Examiner concluded and the Board adopted his conclusions that the company by granting benefits (wage differentials for employees working beyond their normal workday and improved maternity leave of absence benefits) shortly before a Board election interfered with their employees' free choice in that election and thereby committed unfair labor

[1]. 29 U.S.C.A. § 158(a) (1).

[2] "In any election where none of the choices on the ballot receives a majority, a run-off shall be conducted, the ballot providing for a selection between the two choices receiving the largest and second largest number of valid votes cast in the election." 29 U.S.C.A. § 159(c) (3).

[3] "§ 102.70 Runoff election—(a) The regional director shall conduct a runoff election, without further order of the Board, when an election in which the ballot provided for not less than three choices (i. e., at least two representatives and 'neither') results in no choice receiving a majority of the valid ballots cast and no objections are filed as provided in section 102.69. Only one runoff shall be held pursuant to this section." 29 C.F.R. § 102.70(a).

practices within the meaning of Sections 8(a) (1) and 2(6) and 7 of the Act.

(A) *The Extension of Wage Differentials*

■ Prior to the August 1967 election the company had a long-standing policy of paying its employees who worked on the second and third shifts a premium of 5 and 10 cents per hour respectively. Prior to September 1967 day workers working overtime into the later shifts did not receive the hourly premium, but, in September, the plant policy was changed to grant these workers (about 10 percent of the work force at the plant) the premium. It is not disputed that the extension of the shift premium was in fact granted. Section 8(a) (1) "prohibits the conferral of such benefits, without more, where the employer's purpose is to effect the outcome of the election." NLRB v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964).

■ The Board's conclusion that the shift premiums were extended for the purpose of influencing the outcome of the election is supported by substantial evidence considered on the record as a whole. Universal Camera Corp. v. NLRB., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). On August 30, 1967, Plant Manager Gene Lockhart, in a letter to the plant employees, stated:

> The result of the recent union representation election held at the Aiken plant came as a suprise to me and other members of our company's management. We knew that the paid professional union organizers had spent several months and many thousands of dollars to win your support, however, we did not realize that so many Fiberglas people were convinced that a union could serve their best interests.
>
> As a result of the closeness of the vote, I asked each of your supervisors to review the major reasons why so many people voted for unionization. During the past week, I met with each department's supervisory group to frankly discuss any major sources of dissatisfaction and asked for their recommendations as to what should be done to correct present conditions.
>
> Many fine suggestions were made at these meetings.
>
> \* \* \* \* \* \*
>
> In addition, there are some policies that some Fiberglas people regard as unfair. These policies include Sunday seventh day premium pay, maternity leave of absence, Christmas holiday premium pay, shift premium for day people working outside of their regular hours and vacations for people hired after June 1. We are now reviewing these policies and, wherever possible, plan to make changes which will serve the best interests of everyone.
>
> \* \* \* \* \* \*
>
> In all of these actions, we regard the outcome of the recent election as a challenge to do a better job of managing our business in your interest as well as in the interest of the owners and our customers.

In addition, Personnel Manager Brelsford testified at the hearing before the Trial Examiner that the lack of a shift premium had become "a strong point of dissatisfaction among some of our day workers." This testimony and the Lockhart letter support the Board's conclusion that the change in shift premium policy was made for the purpose of inducing the employees to vote against the Teamsters in the runoff election which was then pending.

■ Brelsford also testified that the major reason for extending the shift premium to day workers was that the company had been in a period of tremendous expansion which required the day workers to work much later than their normal hours. Although this latter testimony may be interpreted as supplying a valid business motive for the extension, *see, e. g.,* Imco Container Co. of Harrisburg v. NLRB, 346 F.2d 178 (4th Cir. 1965), it is not our province, where substantial evidence supports the

conclusion of the Board, to substitute our own judgment for that of the Board.

■ The company complains that the pleadings before the Board do not support or permit the Board's conclusion that the company violated § 8(a) (1) by extending shift premiums. The complaint alleged that the company violated § 8(a) (1) by "implementing wage differentials for various shifts." The company alleges that because the complaint did not allege "an extension of the existing shift differentials" the evidence did not support the allegations. The distinction between "implementing" and "extending" shift differentials is one, we believe, without a difference. The allegation is consistent with and inclusive of the proof offered. That the company was aware of the charges it was required to defend against is clearly indicated by the answer of Personnel Manager Brelsford to company counsel's direct examination before the Trial Examiner:

Q: "In September, or approximately September of 1967, what was the shift differential, if any?

A: Well, I'm not sure of the dates on this. The change, I think, is what we're probably trying to get at. The change that we made in shift differentials was to cover people on nonrotating shifts. In other words, this provision was introduced in about September.

■ " 'All that is requisite in a valid complaint before the Board is that there be a plain statement of the things claimed to constitute an unfair labor practice that respondent may be put on his defense.' [American Newspaper Pub. Ass'n v. NLRB, 193 F.2d 782, 800 (7th Cir. 1951).] Such a complaint need state only the manner by which the unfair labor practice has been or is being committed, the absence of specifics being tolerated where there has been no special showing of detriment." Curtis-Wright Corp., Wright Aero. Div. v. NLRB, 347

F.2d 61, 72 (3rd Cir. 1965) (footnotes omitted). The issue of whether there was a § 8(a) (1) violation in extending shift premiums was pleaded adequately to permit the Baord decision, and, indeed, the Board would have been remiss had it not decided the issue.

■ The record here shows that the issue of *extending* shift premiums was fully litigated. It was first brought out on the company's direct examination of its personnel manager, and there was cross-examination on the issue by General Counsel. The "[c]ourts as well as the National Labor Relations Board have held that a material issue which has been fairly tried by the parties should be decided by the Board regardless of whether it has been specifically pleaded." American Boiler Manufacturers Association v. NLRB, 366 F.2d 815, 821 (8th Cir. 1966). This rule finds its origin in the requirement that in Board hearings the rules of evidence applicable in the United States District Courts are, so far as practicable, controlling[4] and in Rule 15(b) Federal Rules of Civil Procedure which provides:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.

### (B) Maternity Leave Benefits

The Board also found that the company had improved maternity leave benefits prior to a Board election in violation of § 8(a) (1). The company contends that this finding is not supported by substantial evidence. The evidence is scanty but uncontradicted that these benefits were granted. The Board's conclusion that the benefits were granted and with the purpose of affecting the outcome of the pending election was based upon two letters written by Plant Manager Lockhart on August 30 and September 13, 1967. The pertinent part of the August 30, 1967, letter has been

4. 29 C.F.R. § 101.10(a).

quoted above. The September 13 letter read in part:

As I wrote in a previous letter, we have been reviewing many of our plant policies. We have already made changes in our maternity leave of absence and shift differential pay policies, and plan to make several other major revisions in the basic policies in the weeks ahead.

■■■ Although the proof was admittedly imprecise, we cannot agree with the company's contention that it was impermissible to infer from the aforementioned letters that the benefits were granted. The Board may not base its inference on pure speculation but it may draw reasonable inferences from the evidence. The company misconstrues the holding in Acme Products, Inc. v. NLRB, 389 F.2d 104 (8th Cir. 1968), which, on its facts, is clearly distinguishable from the case at hand. In *Acme,* the Board had found by a two-to-one decision, contrary to the findings of the Trial Examiner, certain violations of § 8(a) (1), (3) and (5) of the Act. The *Acme* court, in accord with Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), gave particular significance to the Trial Examiner's resolution of credibility issues and concluded that there was no substantial evidence on which the Board could resolve these issues contrary to the resolution made by its Trial Examiner. In the instant case, however, on the issue of maternity leave benefits, no credibility resolution was necessary. The uncontroverted evidence is that additional maternity leave benefits were granted, and this is a sufficient basis on which to ground a finding of a § 8(a) (1) violation where, as the August 30 Lockhart letter indicates, the benefit was granted with the purpose of affecting the outcome of the election. NLRB v. Exchange Parts Co., *supra.*

■■■ The company argues that the pleadings do not support the finding of a § 8(a) (1) violation in regard to the extension of maternity leave benefits because the only proof offered was the letters, and it was not alleged that the letters violated the Act. The argument is without merit. The letters were offered as proof of the fact alleged, that maternity leave benefits were granted, and in the absence of any evidence to the contrary, fully justified the Board in resolving that fact issue against the company.

■■■ Finally, the company seeks to distinguish the instant case from NLRB v. Exchange Parts Co., *supra,* because the extension of shift premiums and maternity leave benefits were granted here (1) before the runoff election was scheduled and (2) five months before it was held. The delay in scheduling and holding the election was, however, due, at least in part, to the fact that the company had filed with the Board objections to the August 1967 election which had to clear the administrative channels before another election could be scheduled. In any event, there could have been no doubt that another election was imminent: a runoff election if the company's objections were overruled, or a rerun if its objections were sustained.[5]

The company unduly emphasizes an excerpt from *Exchange Parts* that "the danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove." NLRB v. Exchange Parts Co., 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (emphasis added). Timing is, of course, a factor, but the thrust of *Exchange Parts* is the condemnation of granting such benefits with the purpose of affecting the outcome of an election. The fact that the benefits here were granted approximately five months before the election bears upon the employer's motive. But it is not conclusive in the face of the company's letters of August 30 and

5. A "runoff" election offers the two choices which received the highest number of votes in the preceding election. See foot- notes 2 and 3, *supra.* A "rerun" would have offered the initial three choices.

September 13 which the Board thought sufficient to show company motive. The Board correctly applied the *Exchange Parts* decision.[6]

## II.

## THE DISCHARGES

The Board found that the company discharged Walter McClain and James Robinson for participating in concerted activities protected by Section 7 of the Act thus violating Sections 8(a) (1), 2(6) and 7 of the Act.[7] The company argues that substantial evidence does not support the Board's conclusion and contends that the activities of McClain and Robinson were not concerted activity and that, even if they were, the protection of Section 7 was lost because their activities were deliberately false and malicious.

The two men were discharged because of their role in the circulation of a petition regarding the difficulties a coworker had in getting a ride from the plant to his home at 4 A.M. after his wife's death in an auto accident. The bereaved employee, Jimmy Hewitt, was first informed of his wife's death by a telephone call at about 2:40 A.M. at which time he asked the caller to come for him. Subsequently, he turned down several offers of cars and offers of rides to his home. At about 3:30 A.M. McClain, while on his way to lunch, met Hewitt and asked why no one had come for him, and offered to take him home. Hewitt declined, explaining that someone was coming for him. After lunch, McClain found Hewitt and again offered him a ride, which Hewitt again declined. While they were talking, Hewitt was summoned to the guard shack to take another telephone call. Also present there were Foreman Tabor, Control Operator Neal McCormack, and one or two guards.

Hewitt's account of the events which then transpired follows:

When I got the second phone call, I said "Jacky, you haven't left to come and get me yet?" He said "no......", and I turned around to Mac [McClain] and I said "Mac, didn't you say that you had your car", and he said "yeah", and I said "well, I may need a way home." Well, then he turned around and he asked Mr. Tabor about taking me home. Well, Mr. Tabor turned around to Mr. McCormack and just nodded his head there, and Neal [McCormack] said "well, Jimmy's [Hewitt] going to be going and that's going to throw us short" and he said "I don't know what we'll do without him if we let two go." He said "we'll be short of help."

Foreman Tabor testified:

So, I turned around to Neal [McCormack], and I said "Neal, what kind of shape are you in", and he said "well, Harold [Tabor], Jimmy's [Hewitt] going home and Walter [McClain] has to leave" he said "that will put us in pretty bad shape", and when I turned around to Walter I told him "no."

Tabor then waited with Hewitt until his ride came at 4:25 A.M. McClain returned to his work in the packing room and told two fellow employees of the episode who, with McClain and a third employee, later confronted Foreman Tabor and asked why there was no plant policy to cover such situations. Tabor agreed to talk with management about the matter. The next night, James Robinson, another packing room employee,

6. The Board did not here order the company to rescind the benefits which were found to have been granted in violation of § 8(a) (1). The Board's order operates *in futuro*: that the company shall not act unilaterally to benefit employees for the purpose of affecting the outcome of an imminent election. Bilateral action would not seem difficult to achieve in a day when the telephone is handy. It is hard to conceive of a union representative withholding agreement to an increase in employee benefits, for to do so would arm the company's argument that the union is not truly interested in the welfare of the employees.

7. 29 U.S.C.A. §§ 158(a) (1), 158(a) (2) and 157.

discussed with a group of employees there the possibility of circulating a petition "objecting to the fact that the company didn't have a policy set up to cover a situation to take a bereaved man home."

The following night, Robinson returned to the plant with a petition drafted with the assistance of a Teamster representative which he, McClain, and eight other employees signed with the understanding that there would be an attachment on the other side explaining how the incident happened. The petition then read:

> We, the undersigned, wish to protest the refusal of the O.F.C. Company to allow a co-worker to be driven home by one of his co-workers, when he received a telephone call telling him about his wife being killed in an auto accident.

After obtaining the signatures, Robinson took the petition to the Teamsters' office where again with the help of a Teamster representative, a handbill was composed. On Thursday morning, September 14, 1967, Robinson and other employees distributed the handbill which incorporated the signed petition under the added heading "We Saw It Happen." On the reverse side was a statement headed, "Lockhart Speaks Out of Both Sides of His Mouth." Also distributed with the handbill was a poem, the contents of which are irrelevant to the issues before us. The "Lockhart Speaks Out" portion of the handbill opened with a cynical remark about the plant manager's letter of August 30 and went on to briefly recount, with substantial accuracy, the events transpiring during Hewitt's second telephone call in the guard shack.

The company, after seeing the handbill and talking to Foreman Tabor, contacted Jimmy Hewitt to get a statement from him. In that statement, which the company had reproduced in bulk, Hewitt said:

> Walter McClain asked Harold [Tabor] if he could take me home and Harold

said he needed Walter in the plant and I didn't feel the necessity of McClain taking me because I already had someone on the way to get me.

On the evening of September 14, the company interviewed and obtained statements from nine of the ten signatories of the petition and suspended them from their jobs pending completion of an investigation. Eight of these employees were subsequently reinstated without loss of pay, but McClain and Robinson were terminated.

Personnel Director Brelsford testified at a hearing before the State Employment Commission, the transcript of which was admitted into evidence at the hearing before the Trial Examiner, that "McClain was discharged because of the untruth that came from him as we saw it against one of our supervisors, and Robinson was discharged as we saw it for spreading it. * * *" The untruth to which Brelsford referred as coming from McClain is in reality a dispute over whether Hewitt asked McClain for a ride home. The company's position that Hewitt did not ask McClain for a ride is based on the statement Hewitt gave to company representatives on the evening after the handbill was distributed. However, both before the State Employment Commission and before the Trial Examiner, Hewitt testified that during his second telephone call in the guard shack, he turned to McClain, asked him if he had a car, and said, "Well, I may need a way home." Both McClain's and Tabor's testimony substantiate this account of the events. In the context of these facts, it was reasonable for McClain to assume, from Hewitt's statement to him, that he was being asked to take Hewitt home. Indeed, it is difficult to attribute any other meaning to Hewitt's statements.

There were two other misstatements of fact contained in the handbill, which Brelsford maintained before the Trial Examiner played some role in the decision to terminate McClain and Robinson: (1) The caption on the petition, "We Saw It Happen" was a misstate-

ment of fact in that only one of the signers, McClain, saw the events which transpired at the guard shack. (2) The final sentence of the "Lockhart Speaks Out" portion of the handbill stated that "[t]he workers had to call someone from Augusta, Georgia, to come to the O.F.C. plant to take this man home," whereas Hewitt himself had already told someone to come for him.

Section 7 provides for the protection of the right of employees to engage in concerted activity for their mutual aid and protection. The Board concluded on the basis of what appeared to be a concession of the issue by company counsel in his opening statement before the Trial Examiner that "[t]he activity of McClain (a) in telling the packing room inspectors about his abortive effort to take Hewitt home, (b) in joining with other employees to urge the preparation of a petition on the matter, and (c) in signing the petition, and the activity of Robinson in preparing and circulating the petition, was 'concerted activity for mutual aid or protection.'" The company still concedes that the circulation of the petition was concerted activity but (1) maintains, as it did before the Trial Examiner, that because of false statements the activity lost the statutory protection and (2) contends that the activity of McClain in relating the events which transpired in the guard shack to the packing room employees and the activity of McClain and Robinson in the solicitation of signatures for and the preparation of the petition was not concerted activity.[8]

■ The contention that McClain's and Robinson's activity was not concerted activity is untenable. Their activity both prior and subsequent to the actual signing of the petition was plainly intended to enlist the support and assistance of other employees for the purpose of correcting what the workers thought to be an inadequacy in working conditions. The activity of a single employee in enlisting the support of his fellow employees for their mutual aid and protection is as much "concerted activity" as is ordinary group activity. The one seldom exists without the other.

■ The company contends finally that the Section 7 protection was lost because there were deliberately false and malicious statements published by McClain and Robinson. The allegedly false statement made by McClain, that Hewitt asked him for a ride home, has already been discussed, and substantial evidence supports the Board's conclusion that McClain made no false statement in this regard.

■ As to Robinson, the company contends, because of the false statements in the handbill, for which Robinson concededly must bear responsibility, that he lost the protection of the statute. It is true that the promulgation of deliberately or maliciously false information is not protected. But, as noted above, there were only two misstatements of fact in the handbill distributed by Robinson, and they, in the light of the surrounding circumstances, afford no substantial basis for concluding that the whole circular was infected with falsity. Undoubtedly, these statements added fuel to the fire, but the center of the controversy was the lack of a set company policy for getting employees home in times of personal tragedy, and that lack was dramatically demonstrated when Tabor admittedly refused to allow McClain to take Hewitt home. The handbill related this event with substantial accuracy and expressed legitimate con-

8. We are aware that 29 U.S.C. § 160(e) provides that "[n]o objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." We are unable on the record to determine the extent to which this issue was litigated before the Trial Examiner and whether or not objections to the Trial Examiner's conclusions on this issue were raised before the Board. In these circumstances, we think it best to consider the merits.

cern. The basic message of the handbill was not so distorted by minor misstatements as to show malicious intent. "Employees do not forfeit the protection of the Act if, in voicing their dissatisfaction with matters of common concern, they give currency to inaccurate information, provided that it is not deliberately or maliciously false." Walls Manufacturing Co., Inc., 137 N.L.R.B. 134 (1962), enforced, 116 U.S.App.D.C. 140, 321 F.2d 753 (1963), cert. denied, 375 U.S. 923, 84 S.Ct. 265, 11 L.Ed.2d 166 (1963).

The order of the National Labor Relations Board will be

Enforced.