**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

EVERGREEN AMERICA CORPORATION,
*Petitioner,*

v.

NATIONAL LABOR RELATIONS BOARD,
*Respondent.*

⎫
⎬  No. 06-2105
⎭

LOCAL 1964, INTERNATIONAL
LONGSHOREMEN'S ASSOCIATION,
AFL-CIO,

*Intervenor.*

NATIONAL LABOR RELATIONS BOARD,
*Petitioner,*

v.

EVERGREEN AMERICA CORPORATION,
*Respondent.*

⎫
⎬  No. 06-2183
⎭

On Petition for Review and
Cross-application for
Enforcement of an Order of the
National Labor Relations Board.
(22-CA-25295)

Argued: January 31, 2008

Decided: June 26, 2008

Before MICHAEL, GREGORY, and DUNCAN, Circuit Judges.

Petition for review denied; cross-application for enforcement granted by published opinion. Judge Gregory wrote the opinion, in which Judge Michael joined. Judge Duncan wrote a separate opinion concurring in part and dissenting in part.

---

## COUNSEL

**ARGUED:** Francis X. Dee, MCELROY, DEUTSCH, MULVANEY & CARPENTER, L.L.P., Newark, New Jersey, for Evergreen America Corporation. David Arthur Fleischer, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for the National Labor Relations Board. Herzl Sol Eisenstadt, MARRINAN & MAZZOLA MARDON, P.C., New York, New York, for Intervenor. **ON BRIEF:** John J. Peirano, William A. Cambria, MCELROY, DEUTSCH, MULVANEY & CARPENTER, L.L.P., Newark, New Jersey, for Evergreen America Corporation. Ronald Meisburg, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Robert J. Englehart, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for the National Labor Relations Board. Christopher P. Getaz, GLEASON, MARRINAN & MAZZOLA MARDON, P.C., New York, New York, for Intervenor.

---

## OPINION

GREGORY, Circuit Judge:

After losing its representation election, Local 1964, International Longshoremen's Association, AFL-CIO ("Union") filed a complaint against Evergreen America Corporation ("Evergreen") with the National Labor Relations Board ("Board"). The Board found that Evergreen committed numerous unfair labor practice violations and issued a bargaining order. On appeal, Evergreen contends that the Board erroneously found that the Union enjoyed a pre-election majority and substantial evidence did not support the Board's factual findings. Evergreen also argues that a bargaining order is unnecessary

because traditional remedies would be more than adequate. We disagree with Evergreen's contentions and enforce the Board's bargaining order in its entirety.

I.

Evergreen is the general agent in North America for three of the world's leading ocean carriers, providing customer service, sales, marketing, logistic and administrative support. In March 2002, two clerical employees of Evergreen met with the Union to discuss the Union's representation of Evergreen's clerical employees in northern New Jersey. After holding a meeting on April 15, 2002, the Union distributed authorization cards which would allow the Union to represent the employees. The employees also formed an organizing committee to circulate additional cards among the employees that were not able to attend the meeting. Some authorization cards were signed at the meeting. Others were given to employees who distributed them to other employees; both groups of employees obtained signed cards from other employees. By June 15, 2002, sixty-two of the 115[1] employees in the appropriate bargaining unit had signed authorization cards. On June 4, the Union filed a petition for an election among Evergreen's clerical employees in northern New Jersey. The election was held on July 17, and the Union lost by a vote of sixty-one to fifty-two.

After losing the election, the Union filed unfair labor practice charges with the Board. The Board's General Counsel ("General Counsel") issued a complaint, which alleged that Evergreen had committed numerous violations of Sections 8(a)(3) and (1) of the National Labor Relations Board Act ("Act") (29 U.S.C. §§ 158(a)(3) and (1)) and that a bargaining order was necessary to remedy those violations. After a lengthy hearing, the Administrative Law Judge ("ALJ") issued a decision sustaining most of the allegations in the complaint, dismissing others, and recommending a bargaining order to remedy the violations found. Evergreen and the General Counsel filed exceptions.

---

[1]The record provides two different totals for the number of employees in the bargaining unit, 114 and 115. We used the higher total in our analysis because the union had a majority even when using the higher total.

   The Board found that the Union had valid cards and that Evergreen violated Section 8(a)(1) of the Act by unlawfully interrogating employees on thirteen occasions; soliciting employee grievances and implicitly promising to remedy them on fifteen occasions; explicitly making the same promise on eight occasions; threatening reprisals on nine occasions; twice instructing employees not to attend union meetings and to throw away union literature without reading them; and once creating the impression those employees' union activities were under surveillance. The Board further found that Evergreen violated Sections 8(a)(3) and (1) of the Act by granting unprecedented large across-the-board wage increases to bargaining-unit employees, and promoting an unprecedented number of such employees prior to the election and by granting eight other benefits, before and after the election, to dissuade the employees from supporting the Union.

   The Board also found that the unfair labor practices described above, as well as other unfair labor practices not contested in this Court, rendered it unlikely that a fair rerun election could be held. Further, the Board found that these unfair labor practices had not been effectively repudiated nor had the passage of time diminished their effect. Accordingly, the Board concluded that a *Gissel* II bargaining order was necessary to remedy those violations. The Board ordered Evergreen to cease and desist from the unlawful conduct, to bargain with the Union upon request, and to take other affirmative remedial action. Evergreen filed a petition for review in this Court, and the Board filed a cross-application to enforce the bargaining order.

II.

   In its petition, Evergreen first contends that facts found by the Board do not support its inferences or conclusions that Evergreen committed "hallmark" violations. In support of its conclusion that Evergreen committed unfair labor practices, the Board found that prior to the election Evergreen (1) granted unprecedented and excessive across-the-board wage increases to unit employees; (2) manipulated its promotion process in order to promote more unit employees than in past years; (3) promised to remedy grievances in order to encourage employees to reject representation; and (4) granted employees new or improved benefits, some of which were granted after the election.

It is now well settled that Board findings of fact are conclusive as long as they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); *Overnite Transp. Co. v. NLRB*, 280 F.3d 417, 428 (4th Cir. 2002) (en banc) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490-91 (1951)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). While "[t]he Board may not base its inference on pure speculation . . . it may draw reasonable inferences from the evidence." *Overnite Transp. Co.*, 280 F.3d at 428 (citing *Owens-Corning Fiberglas Corp. v. NLRB*, 407 F.2d 1357, 1362 (4th Cir. 1969)). Even though we might reach a different result after hearing the evidence in the first instance, we defer to the Board's findings of fact that are supported by substantial evidence. *Id.* (citing *NLRB v. Daniel Constr. Co.*, 731 F.2d 191, 193 (4th Cir. 1984)).

Under this standard, we conclude that substantial evidence supports each of the Board's findings and address their specific findings with respect to the unprecedented wage increases, the unprecedented promotions, promises to correct grievances, and the new and improved benefits *seriatim*.

A.

Evergreen contends that the Board ignored substantial business reasons for the across-the-board wage increases. Specifically, Evergreen claims that its wage structure was falling behind its competitors and it needed to reduce employee turnover because the company expected an improved financial environment and substantial business expansion.

"On July 15, 2002, two days before the election, Evergreen's [115] bargaining unit employees received their paychecks, which included across-the-board raises of $400 per month for all bargaining unit employees. This was the first year employees had received across-the-board increases." (J.A. 1182.) The Board found that "[p]rior increases had been given to employees, based primarily upon a 'merit' system, wherein evaluations given by supervisors that reveal a numerical score for each employee, is utilized by upper management to decide upon increases for employees." (J.A. 1182.) Based upon this system,

depending upon the score received by employees, some employees would not receive any raise at all on account of a low score. The Board found that ninety-three percent of the bargaining unit employees received a bigger salary increase in 2002 than they had in the three previous years *combined*. The Board also found that during the course of the organizational campaign, various Evergreen supervisors spoke to several employees regarding raises and/or Evergreen's business.

In response to Evergreen's alleged justification, the Board found that although there was evidence that Evergreen had increased its quantity of service, "[Evergreen had] not demonstrated that there had been at that time any increase[] in revenue or in profits." (J.A. 1191.) Although there was testimony that profits and revenues were gradually increasing at that time, this testimony had not been substantiated by any documentary evidence. To the contrary, as was found by the Board, "[Evergreen's] position paper establishes that the first 6 months of 2002, [Evergreen's] revenues were substantially lower than they had been for the comparable period in 2001 when business was allegedly so bad that it postponed its July raise to October." (J.A. 1191.) After a detailed explanation, the ALJ concluded that "in the context of these unfair labor practices, reasonable employees would have viewed the 2002 wage increase as having been conferred by [Evergreen] in order to undermine support for the Union." (J.A. 1192.)

After reviewing the record, we find that there was substantial evidence to support the Board's conclusion.

### B.

In July 2002, Evergreen employed 115 employees in the bargaining unit. Prior to the July promotions, sixty-two employees were eligible for promotions from General Schedule employee ("GS") to Assistant Manager ("AM"). On July 1, 2002, twenty employees in the unit were promoted to AM. Based on testimony from several witnesses, the Board found that there was essentially no difference between AM and GS job functions. The Board also found that "the promotion to AM is essentially a reward for superior performance, which entails addi-

tional compensation." (J.A. 1193.) In the previous two years, a total of six people had been promoted.

The record revealed that one of the employees promoted, Chris Yu, was notified of her promotion by her supervisor Kevin Huang on or about July 1, 2002. Huang congratulated Yu and informed her that she was promoted to AM effective July 1, 2002. During that same conversation, Huang told Yu that the Union is "no good," and asked her if she had decided which "side to choose" in the election. (J.A. 1194.) Yu replied that she had not chosen a side yet. Huang then reminded her that the Company treats its employees well, so "don't let the company down." (J.A. 1194.)

Sherry Yao, also promoted, testified that she worked at Evergreen for thirteen years. She was also told by Jimmy Kuo, an Evergreen executive, that "the Union is not good for her, is controlled by the Mafia and was trying to take money from her." (J.A. 1194.) Kuo asked for suggestions about changes in the company or any complaints about her treatment by Evergreen. Yao responded that she had been working for the company a long time and had not had a promotion. Kuo acknowledged that it was difficult to judge why she had not been promoted although he attributed some of the decisions to luck. According to Yao, there were about ten employees in her department, and for the past three years, there were no promotions in that department. (J.A. 1194.)

The Board was not required to identify how many promotions would have been authorized absent the Union's campaign, but it did find that Evergreen did not establish that it would have promoted twenty or even seventeen employees, if not for the presence of the Union. Thus, the Board concluded that Evergreen manipulated the promotion process in order to influence employees to withdraw their support for the Union and to vote against the Union in the election. (J.A. 1198.) We find that there was substantial evidence to support the Board's conclusion.

## C.

Evergreen contends that there was not substantial evidence to support the Board's finding that Evergreen's President Thomas Chen

promised to remedy grievances in his speeches before employees in the bargaining unit in order to encourage employees to reject representation. President Chen stated "that concerns of employees can best be addressed directly without intermediaries," that he had asked managers to consider items important to the staff, that Evergreen listen to and consider employees recommendations for improvement, if Evergreen does not make the effort to deal with employees' concerns, they are giving opportunities for unions to come into the work place, and he hoped that employees would give the company one year to "address your concerns," and "let's make the best of this situation giving [Evergreen] a chance." (J.A. 1172.)

As the Board observed, "statements that request employees to give the employer another chance or a second chance are considered within the limits of campaign propaganda, and are not unlawful promises of benefit." *Noah's New York Bagel*, 324 NLRB 266 (1976); *Nat. Micronetics*, 277 NLRB 993 (1985). However, as the Board found, President Chen went further than merely asking for a chance to show improvement. President Chen "specifically referred to suggestions made by employees to management, promised to address the employees' concerns, without 'intermediaries' i.e., the Union." (J.A. 1172.) According to the Board, the type of statements made by President Chen "which link improvements in benefits with defeat of the Union are sufficient to conclude that a reasonable employee would understand the unlawful message that changes would occur more readily if the employees voted against the Union." (J.A. 1172.)

The Board also noted that President Chen's statements were merely one aspect of an "extensive and pervasive campaign of unlawful solicitation of grievances" as well as other unfair labor practices. (J.A. 1172.) The Board also pointed out that the solicitations, including the statements by President Chen, represented a substantial departure from Evergreen's prior practice. Before the Union's organizational campaign began, Evergreen not only did not solicit suggestions from employees, but also ignored whatever suggestions the employees did make. We find substantial evidence to support the Board's conclusion.

### D.

Evergreen also contests the Board determination that five benefits granted by the company after the election should not have been found

unlawful. These grants of benefits occurred between late August 2002 and January 2003, while the Union's objections to the election were pending and a rerun election was a possibility. A grant of benefits under these circumstances, if designed to erode union support in any likely rerun election, is no less unlawful than a grant of benefits designed to erode union support in a scheduled initial election. *NLRB v. Wis-Pak Foods, Inc.*, 125 F.3d 518, 525-26 (7th Cir. 1997).

Contrary to Evergreen's contention, the Board did not simply infer unlawful motivation solely from the timing of the benefits. The Board also noted that three of the benefits granted (the year-round casual dress, the improved sick-leave benefits, and the right to bring spouses to the Christmas Party) were requested by employees in response to Evergreen's unlawful solicitation of grievances. The employees had previously requested and Evergreen had rejected requests before the Union's organizational campaign, only to grant them shortly after the Board election. (J.A. 1178-1182). After reviewing the record, we find that there was substantial evidence to support the Board's conclusion.

III.

Next, Evergreen argues that the bargaining order is unnecessary because traditional remedies would be more than adequate. The Board concluded that Evergreen's labor practice violations were so particularly coercive because of their tendency to destroy election conditions and to persist for longer periods of time than other unfair labor practices. As a result, simply requiring Evergreen to refrain from unlawful conduct would neither eradicate the lingering effects of the violations it committed nor deter their recurrence. The Board found that the employees' desire for representation, would be better protected by a bargaining order than by traditional or special remedies that Evergreen contends were not considered by the ALJ. The Board finally concluded that it is unlikely that a fair rerun election could be held because of the lasting effects of Evergreen's violations and found that a bargaining order was appropriate.

"[I]t is the strong preference of our national labor policy not to impose collective bargaining representatives on employees except when they have, by a majority vote, elected to be so represented." *Overnite Trans. Co.*, 280 F.3d at 435-46 (internal citations omitted).

"Because an election, not a bargaining order, remains the traditional, as well as the preferred, method for determining the bargaining agent for employee, the extraordinary and drastic remedy of forced bargaining pursuant to *Gissel* orders are available only when traditional remedies are insufficient to make possible a 'fair and reliable election'." *Id.* (internal citations omitted). The Board must also make "specific" and "detailed" findings. *Id.*

In essence, *Gissel* orders may be entered in two types of cases: (1) Category I cases, where "exceptional," "outrageous," and "pervasive" unfair labor practices have occurred and the coercive effects of such practices "cannot be eliminated by the application of traditional remedies"; and (2) in less extraordinary, Category II, cases. *Be-Lo Stores v. NLRB*, 126 F.3d 268, 274-75 (4th Cir. 1997).

> To satisfy the requirements for imposing a Category II *Gissel* order-the type involved in this case-the Board must make detailed findings specifically supporting the facts that (1) the Union enjoyed a pre-election majority in the relevant unit; (2) the employer committed an unfair labor practice; (3) the unfair labor practice caused the Union's majority status to be dissipated; (4) the possibility of conducting a fair reelection would be slight; and (5) the employees' pre-election sentiments would be better protected by a bargaining order than by a new election. In turn, to find that the possibility of conducting a fair election would be slight and that employees' pre-violation sentiments would be better protected by a bargaining order, the Board must specifically consider and make findings about (a) the likelihood of recurring misconduct; (b) the residual impact of unfair labor practices, considering whether that effect has been or will be dissipated by the passage of time; and (c) the efficacy of ordinary remedies. *See generally Gissel*, 395 U.S. at 613-14; *Be-Lo*, 126 F.3d at 282.

*Overnite Transp. Co.*, 280 F.3d at 436. In *Overnite*, we held that while the Board properly considered the first three factors in this analysis, the Board nonetheless abused its discretion by "fail[ing] . . . to direct us to evidence that a new fair election could not be conducted." *Id.* Because the Board failed to make the requisite findings and relied

heavily on a finding of a post-election unfair labor practice that was unsupported by the evidence, we held that the bargaining order could not be enforced. *Id.* at 436-37. In this case, in contrast, the Board described its reasoning with "scrupulous specificity," *Id.* at 438, and with particular attention to each of the factors we enunciated in *Overnite*. Furthermore, as we explain, the Board's findings — including its findings of unfair labor practices that persisted after the election — are supported by substantial evidence in the record, and therefore warrant deference from this court. *See id.* at 428.

The first requirement for imposing a *Gissel* order is that the Board find that the Union enjoyed a pre-election majority in the relevant unit. Evergreen argues that the Board wrongly rejected its challenge to six authorization cards and that Evergreen did not in fact have a pre-election majority. Evergreen stated (1) that none of the six signers testified nor did any who witnessed their signatures testify, and (2) that no one testified that these employees returned cards directly to a solicitor, or acknowledged signing the cards. Evergreen believes that one of these two forms of evidence is required to authenticate these cards.

The Board found that, on June 15, 2002, the Union possessed signed authorization cards from 62 of the 115 unit employees. Evergreen challenges six cards: those signed by employees Michael Biscocho, Katelin Li, Virginia Huang, Marina Peda, Michael Kelly, and Paresha Shah. Since fifty-six cards are uncontested, the Board's finding of majority status must be upheld if it properly counted any two contested cards.

The Board found that the Biscocho and Li cards were valid on the basis of the credited testimony of Union President Robert Levy. At a meeting on April 15, 2002, Levy distributed authorization cards to employees and, at the end of that meeting, six to ten employees returned signed cards. He specifically identified the signed cards of Biscocho and Li as among those returned to him. "It is well settled that absent exceptional circumstances, the ALJ's credibility findings, 'when adopted by the Board are to be accepted by the [reviewing] court.'" *NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983) (citation omitted).

Contrary to Evergreen's contention, neither Levy's failure to witness the signing of the cards nor his lack of personal acquaintance with Biscocho or Li precludes his authentication of their cards. The Board has long held that it will accept as authentic any authorization card returned by the signer to the solicitor. *See McEwen Mfg. Co.*, 172 NLRB 990, 992, 993 (1968) (cards of Palk and Black), enforced sub nom. *Clothing Workers v. NLRB*, 419 F.2d 1207, 1209 (D.C. Cir. 1969). *Accord NLRB v. Gen. Wood Preserving Co.*, 905 F.2d 803, 812 (4th Cir. 1990). This is true even when the solicitor is confused about who returned the cards. *See Photo Drive Up*, 267 NLRB 329, 363 (1983) (Sweeney card); *Stride Rite Corp.*, 228 NLRB 224, 235 (1977) (cards of Jones and Michel). We find that the cards of Biscocho and Li were properly counted.

The other four contested cards were solicited by employee Maria Magbanua, who gave each employee a card in an envelope. All four employees returned the envelopes to her a few minutes later, saying "here." (J.A. 60-61, 63-68.) Magbanua did not open the envelopes, but gave them to her husband, employee Paolo Magbanua, who opened them and found signed authorization cards, which he passed on to the Union's leading employee organizer. (J.A. 63, 66, 96-98, 103-04.)

The Board found (J.A. 1132, 1145) that these cards were valid under a "chain of custody" theory. The short time between the distribution of the cards in envelopes and their return in the same envelopes, along with the employees' comment "here," strongly suggested to the Board that the employees had signed the cards and were returning them to the solicitor. When Paolo Magbanua opened the envelopes, he found signed cards in them. We believe this strengthens the inference that the signed cards had been in the envelopes when they were returned to Magbanua. In addition, Huang had asked for a card and said she wanted to join the Union, Peda had called Maria and said she wanted to join the Union, and Kelly and Shah had said they wanted union representation in telephone conversations with the Magbanuas. The Board was warranted in concluding that their cards were like the one, solicited by one brother and returned to another, which was found valid in *Sheraton Hotel Waterbury*, 312 NLRB 304, 346 (1993), *enforcement of bargaining order denied on other grounds*, 31

F.3d 79, 83-85 (2d Cir. 1994). Accordingly, these four cards were properly counted.

Having affirmed the Board's determination that Evergreen committed numerous labor practice violations, we hold that the second requirement for imposing a *Gissel* order, that the Board find the employer committed an unfair labor practice, is satisfied. In fact, Evergreen's violations were some of the worse in magnitude and frequency. The Board found that Evergreen violated the Act by unlawfully interrogating employees on thirteen occasions; soliciting employee grievances and implicitly promising to remedy them on fifteen occasions; explicitly making the same promise on eight occasions; threatening reprisals on nine occasions; twice instructing employees not to attend union meetings and to throw away union literature without reading them; and once creating the impression those employees' union activities were under surveillance. The violations in *Overnite* pale in comparison. The Board further found that Evergreen violated Sections 8(a)(3) and (1) of the Act by granting large and unprecedented across-the-board wage increases to bargaining-unit employees, and promoting an unprecedented number of such employees prior to the election, and by granting eight other benefits, before and after the election, to dissuade the employees from supporting the Union.

The other *Gissel* requirements are also met. The Board found that the Union had a majority of sixty-two but lost by a ballot count of sixty-one to fifty-two. The Board concluded that the Union's majority status dissipated as a result of Evergreen's unfair labor practices (i.e., unprecedented wage increases, unprecedented promotions, promises to correct grievances, and the new and improved benefits).

Thus, like in *Overnite*, the Board did not err in analyzing the first three *Gissel* factors. In contrast to *Overnite*, however, the Board here also carefully explained, considering the required factors, "why the possibility of conducting a fair election would be slight and that employees' pre-violation sentiments would be better protected by a bargaining order." *Overnite*, 280 F.3d at 436. First, the Board found that the possibility of conducting a fair reelection would be slight because of the lasting and pervasive effect of Evergreen's unfair labor violations, many of which were committed by high management offi-

cials, and the benefits provided to employees could not be undone. The Board relied on the dozens of pre- and post-election violations noted, all of which are supported by substantial evidence. *Cf. Overnite*, 280 F.3d at 435, 436 (rejecting the Board's reasoning because "its assessment rested almost entirely on its conclusion that the [post-election] wage increase violated § 8(a) of the Act," a finding that was not supported by substantial evidence). Further, in *Overnite*, an important reason for our decision to deny the Board's grant of a bargaining order was evidence in the record that the management team responsible for the labor practice violations had left the company. However, here there is no evidence in the record that there has been a change in the management team responsible for Evergreen's labor practice violations.

Also, the Board found it significant that Evergreen did not desist in its unlawful conduct even after the Union lost the election. Evergreen committed five additional violations after the election by providing additional benefits to employees, "such post election action demonstrates [Evergreen's] continuing propensity to violate the [National Labor Relations Board Act] and indicates that the coercive effects of its unlawful conduct are likely to linger, making it highly unlikely that a free fair election can be held." (J.A. 1134.) Thus, the Board properly concluded the employees' pre-election sentiments would be better protected by a bargaining order than by a new election.

The Board also made explicit findings that employee turnover and the passage of time did not make a reelection an appropriate remedy. In *Overnite*, another important reason for our decision to overturn the Board's bargaining order was evidence that employee turnover had been substantial in the effected bargaining units. However, here the Board found that Evergreen while asserting that it had added 100 employees between 2002 and 2004, "did not indicate how many, if any, of these 100 new employees were additions to the bargaining unit that was subjected to Evergreen's numerous and serious unfair labor practices." (J.A. 1135.) Furthermore, the Board found that Evergreen did not present any evidence of the number of employees who were in the unit during the commission of the unfair labor practices and had since departed from the unit. Thus, Evergreen did not show a "danger that a bargaining order that is intended to vindicate the

rights of past employees will infringe upon the rights of current ones to decide whether they wish to be represented by a union." *Flamingo Hilton-Laughlin v. NLRB*, 148 F.3d 1166, 1170-71 (D.C. Cir. 1998).

With regard to the passage of time, the Board found that four years had passed since the commission of Evergreen's unfair labor practices, and more than one year since the date of the ALJ's decision. The Board concluded that the passage of time since Evergreen's violations did not make the *Gissel* order unacceptable, and the Board specifically noted that courts had enforced bargaining orders involving comparable time periods. Furthermore, the passage of time since the violations occurred until when the Board issued the bargaining order (four years) is significantly less than the same time period in *Overnite* (six years).[2] Based on the Board's careful and detailed reasoning, which is supported by substantial evidence in the record, we defer to its findings and conclusions.

## IV.

For the foregoing reasons, we enforce the bargaining order.

*PETITION FOR REVIEW DENIED;*
*CROSS-APPLICATION FOR ENFORCEMENT GRANTED*

DUNCAN, Circuit Judge, concurring in part and dissenting in part:

"Because an election, not a bargaining order, remains the traditional, as well as the preferred, method for determining the bargaining agent for employees, the extraordinary and drastic remedy of forced bargaining . . . is reserved for only the most unusual cases." So held this court in an en banc ruling just six years ago, in rejecting the NLRB's attempt to impose a bargaining order to remedy an employer's across-the-board wage increase granted just before a union-representation election. *See Overnite Transp. Co. v. NLRB*, 280 F.3d

---

[2]It should also be noted that the bargaining order was issued following the issuance of an injunction by the federal district court in New Jersey, ordering Evergreen to recognize and bargain with the Union. Our order essentially helps to maintain those obligations. *Kendellen v. Evergreen America Corp.*, 428 F.Supp.2d 243 (D.N.J. 2006).

417, 436 (4th Cir. 2002) (en banc) (internal citations and quotations omitted). Because neither the majority nor the Board has adequately explained why the labor violations here, arguably less egregious than those in *Overnite*, make this among "the most unusual cases" warranting "the extraordinary and drastic remedy of forced bargaining," *id.*, I respectfully dissent from Part III of the majority's opinion.

I.

I begin, as I must, with our controlling precedent in *Overnite*. Facing a Teamsters campaign to unionize several of its trucking service centers, Overnite Transportation Company ("Overnite") responded by granting a supplemental and sizeable national pay increase, announced just one month after the company's regularly scheduled annual wage increase and implemented while dozens of union elections were pending. Overnite trumpeted the supplemental wage increase in a letter to all employees and in its newsletter but explained that employees at recently unionized service centers were ineligible for the increase because unilateral benevolence by Overnite was prohibited without prior union approbation. In subsequent litigation, the Board found that Overnite's actions violated the NLRA. Relying on the severity of the violations and the fact that they were carried out by high-ranking company officers, the Board concluded that the traditional remedy of ordering new elections was insufficient to protect Overnite's employees, instead imposing a "*Gissel* Category II" order[1] requiring Overnite to recognize the Teamsters as the bargaining representative for the employees.

---

[1]The Supreme Court first announced the availability of this remedy in *NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969). A forced bargaining order under *Gissel* requires an employer to recognize and negotiate with a union, as representative of the employees in question, despite the fact that the union did not prevail in a free election. A *Gissel* order may be imposed in those cases "marked by 'outrageous' and 'pervasive' unfair labor practices" ("Category I" cases), or in "less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes" ("Category II" cases). *Id.* at 613-14. There is no dispute that the order imposed here fell under Category II.

On petition for review, this court unanimously agreed with the Board that Overnite's actions were intended to improperly influence union elections, in violation of the NLRA. *See Overnite*, 280 F.3d at 428. A majority of this court disagreed with the Board, however, as to the appropriate remedy for Overnite's NLRA violations. *Id.* at 428-29.

Drawing on long-standing circuit precedent, the *Overnite* court explained that the Board cannot impose a Category II *Gissel* order without first making "detailed findings specifically supporting [inter alia] the facts that . . . the possibility of conducting a *fair* reelection would be slight; and . . . the employees' preelection sentiments would be better protected by a bargaining order than by a new election." *Id.* at 436. The court explained that a *Gissel* order is inappropriate unless the Board finds that the unlawful conduct is likely to recur, or its effects likely to persist without being dissipated by time, thereby rendering ordinary remedies ineffective. *Id.* Applying these rules to Overnite's violations, this court concluded that the Board had "spoke[n] only in a conclusory manner" and had not "direct[ed] the court to any factually based reason why new elections could not be fair" some six years after Overnite's last NLRA violation. *Id.*[2]

I would conclude here, like this court did in *Overnite*, that the Board failed to demonstrate with "scrupulous specificity" why a new election would not be fair and why the employees' representational desires would be better protected by the "drastic remedy of forced bargaining."[3] *Id.* at 436, 438. As in *Overnite*, Evergreen's primary NLRA violation was awarding a widespread wage increase against the backdrop of pending union elections. Furthermore, there is scant evidence that Evergreen persisted in violating the NLRA after the 2002 elections, just as the Board in *Overnite* could not there point to ongoing

---

[2]The *Overnite* court also pointed to employee and management turnover as additional evidence that new elections could be fair. 280 F.3d at 437.

[3]These failings are those of the Board, not the majority. It is therefore the Board on remand, and not the majority by post-hoc rationalization, that should remedy the deficiencies by either offering adequate support for the levying of a bargaining order or by imposing less draconian penalties upon Evergreen.

violations. In fact, an Evergreen wage increase awarded in 2003 was found to be proper in a separate proceeding. Since this full court found a bargaining order inappropriate in *Overnite*, I cannot see how, on the comparable or less egregious violations before us, a bargaining order is warranted.[4]

The Board (and the majority, by deferring to the Board), however, makes much of the minor grants of benefits Evergreen implemented in the months following the 2002 election. *See* Majority Op. at 8-9, 12-14. The Board reasoned that, since Evergreen became aware of some of these grievances through solicitation just *before* the election, its remedying the grievances in the months *after* the election "fortif-[ied] the impression in the minds of employees that the benefit grants were designed to dissuade them from supporting the Union." *Evergreen Am. Corp.*, 348 N.L.R.B. No. 12, at 3 (2006). The *Overnite*

---

[4]The majority's assertion that the violations in *Overnite* "pale in comparison" to those here mischaracterizes the scope of the violations in *Overnite*. *See* Majority Op. at 13. Fairly read, the record before us reveals that the wage increase at issue in *Overnite* was decidedly more inappropriate than that here. The majority neglects to acknowledge that, in *Overnite*, the *timing* of the wage increase, not just the scope, was found to be improper. *See Overnite*, 280 F.3d at 429. Furthermore, the majority's listing of other violations that were found here ignores the fact that similar or worse violations were found in *Overnite*. *See Overnite Transp. Co.*, 329 N.L.R.B. No. 91, at 5 (1999) (destruction of pro-union literature, express promises of benefits, solicitations of employee grievances, and threats of plant closure and loss of jobs if the union prevailed). Indeed, in *Overnite*, the other violations were so rampant that the parties entered into a settlement agreement to resolve many of them before the case ever reached the Board. *See id.* at 2.

Nor do the violations here rise to the level of those previously found by this court to warrant imposition of a *Gissel* Category II bargaining order. *See, e.g.*, *NLRB v. CWI of Maryland, Inc.*, 127 F.3d 319 (4th Cir. 1997) (enforcing bargaining order where employer constructively discharged all bargaining unit employees); *NLRB v. So-Lo Foods, Inc.*, 985 F.2d 123 (4th Cir. 1992) (enforcing bargaining order where employer threatened to close its stores if the union were elected); *NLRB v. Maidsville Coal Co., Inc.*, 718 F.2d 658 (4th Cir. 1983) (enforcing bargaining order where employer discharged four union supporters for their union activities and interrogated employees regarding their union sympathies).

court disallowed the Board a similar inference, and I would find it unreasonable here as well.[5] Absent evidence demonstrating that these benefits, of such moment as a relaxation of the dress code and an expansion of the guest list for the Christmas party, were awarded with the intention of interfering with union activities or elections, the benefit grants alone simply do not support the inference that a new election could not be fair. To allow the Board to infer that post-election grants of benefits render a hypothetical, unscheduled future election unfair would seem to lock employers and employees into maintaining the status quo after an election, *even when the union lost the election*. *See Overnite*, 280 F.3d at 430-31 (finding proper a wage increase that was awarded *after* the majority of elections had already been held).[6]

The Board also failed to make the detailed findings, required by *Overnite* before a bargaining order can be imposed, that the significant lapse of time since the violations had not made practicable a new, fair election. Rather, the Board summarily concluded, "In these circumstances, we do not consider the passage of time since [Evergreen's] violations unacceptable for *Gissel* purposes." *Evergreen Am. Corp.*, 348 N.L.R.B. No. 12, at 5. This conclusion improperly implies that *Gissel* orders are the default or preferred remedy, not an "extraor-

---

[5]After the initial national wage increase, Overnite granted another wage increase the following year. Because the second increase was offered to all employees and post-dated the fervent union campaign of the prior year, this court rejected the Board's conclusions that this post-election wage increase was improper and would render new elections unfair. *See Overnite*, 280 F.3d at 430-31.

[6]The majority asserts repeatedly that it is appropriate to defer to the Board's factual findings if they are supported by substantial evidence. *See* Majority Op. at 5, 11, 14, 15. The majority conflates, however, the Board's factual findings regarding the *existence* of pre- and post-election NLRA violations with its predicate findings, required by *Overnite* before a bargaining order may be imposed, that those violations *would render a new election unfair*. Put differently, that the minor post-election grants of benefits might constitute NLRA violations does not mean that the Board can assume that "the possibility of conducting a *fair* reelection would be slight; and . . . the employees' preelection sentiments would be better protected by a bargaining order than by a new election." *Overnite*, 280 F.3d at 436. It is the Board's finding that a new election would be unfair that is not supported by substantial evidence.

dinary and drastic remedy . . . reserved for only the most unusual cases." *Overnite*, 280 F.3d at 436 (internal quotations omitted). The Board's conclusion is also in direct conflict with our reasoning in *Overnite* that, "'It strains credulity to believe that [a company's] unfair labor practices, such as they were, had such long lasting effects that a fair rerun election could not have been held four years later, much less today, some six years after the original violations occurred.'" *Id.* at 437 (quoting *Be-Lo Stores v. NLRB*, 126 F.3d 268, 282 (4th Cir. 1997)). Here, too, six years have passed since the initial elections,[7] and the Board's conclusory brush-off of the aging of Evergreen's sins cannot be a "specific[] . . . detailed finding[]" sufficient to overcome our preference for new elections. *Id.* at 436.

Finally, the Board hardly passed on "the efficacy of ordinary remedies," *id.*, such as new elections, at all, aside from a single conclusory sentence. *See Evergreen Am. Corp.*, 348 N.L.R.B. No. 12, at 5 ("[W]e find that the employees' representational desires . . . would be better protected by a bargaining order than by traditional or special remedies."). But democratic elections form the bedrock of our labor system for good reason:

> [B]ecause circumstances . . . may change during the interval between the occurrence of the employer's unfair labor practices and the Board's disposition of a case, there is an obvious danger that a bargaining order that is intended to vindicate the rights of past employees will infringe upon the rights of the current ones to decide whether they wish to be represented by a union.

*Flamingo Hilton-Laughlin v. NLRB*, 148 F.3d 1166, 1170-71 (D.C. Cir. 1998) (internal quotations and alterations omitted). I find no justification in the Board's order for abandoning the presumption that a

---

[7]The majority asserts that six years passed between the original violations in *Overnite* and the issuance of the Board's order. *See* Majority Op. at 15. This is simply inaccurate. In *Overnite*, the Board's 1999 order followed the 1995 violations by four years. This timespan is relevant because it parallels the relevant span here: four years from violations to Board order, and six years from violations to the opinion of this court.

new Board-monitored, free election can adequately capture the desires of Evergreen's current workforce.[8]

## II.

At bottom, I view this case as falling squarely under our recent en banc precedent in *Overnite*. I would likewise hold, then, that "[b]y declining to follow our long-standing precedents for the application of *Gissel*, the Board improperly bypassed the employees' will on the question of representation, frustrating the fundamental policy of employee democracy established by Congress in the labor laws." *Id.* at 422. I would accordingly grant in part Evergreen's petition for review, deny the cross-application for enforcement, and remand for new elections.

---

[8]Contrary to the majority's assertion, our granting the petition for review would not upset any permanent "obligations" of Evergreen to the union. *See* Majority Op. at 15 n.2. The *temporary* injunction issued in 2006 by the United States District Court for the District of New Jersey, *Kendellen v. Evergreen Am. Corp.*, 428 F. Supp. 2d 243 (D.N.J. 2006), provided the union only *temporary* relief "pending the Board's resolution of [the] unfair labor practice proceedings." *Id.* at 245. The Board having since issued its order, the *Kendellen* injunction no longer governs Evergreen's relationship with the union, and certainly would present no bar to this court finding that the Board erred by imposing a bargaining order.